[Crim. No. 44181. Second Dist., Div. Seven. Apr. 18, 1985.]

In re AURELIO R. et al.,
Persons Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
AURELIO R. et al., Defendants and Appellants.

**COUNSEL**

Quin Denvir and Frank O. Bell, Jr., State Public Defenders, under appointment by the Court of Appeal, Steffan Imhoff, Deputy State Public Defender, and Russell Iungerich for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Gary R. Hahn and Robert F. Katz, Deputy Attorneys General, for Plaintiff and Respondent.

---

OPINION

JOHNSON, J.—This appeal has become moot as to one of the appellants, Aurelio R. On April 24, 1984, the superior court vacated the underlying adjudication and disposition against this appellant on grounds of ineffective assistance of counsel. In subsequent months, the People failed to appeal that ruling or to proceed against him in a new adjudication under this petition and on October 9, 1984, jurisdiction was terminated. Consequently, this appeal now only deals with appellant Fernando R.

I. FACTS AND PROCEEDINGS BELOW

The appellant, Fernando R., is a member of a juvenile gang—the Avenue Gang. The previous Saturday the Cypress Park Gang had shot an Avenue Gang "homeboy." At about eleven on the evening of December 20, 1982, the appellant and four other "homeboys" from the Avenue Gang decided to drive into the Cypress Park area. The other "homeboys" were Aurelio R., Caesar Salas, Thomas Carmona and Gilberto Duran. Duran brought along a shotgun because they had decided to shoot a member of the Cypress Park Gang in revenge for the wounding of their fellow gang member a few days earlier. Others in the party also may have been armed with shotguns or other weapons.

The automobile used for this incursion into "enemy territory" was a green station wagon belonging to Aurelio R. However, it was driven by the appellant, Fernando R., because he was more familiar with the area than Aurelio. Salas was in the front passenger seat and Aurelio in the back with Duran and Carmona.

At about midnight, as they neared the intersection of Isabel and Jeffries a white station wagon with one lit headlight began following them. One of the Avenue Gang "homeboys"—by one account, Duran—fired the shotgun several times in the direction of the white station wagon. The occupants of that car returned the fire.

Either before or during this initial exchange of gunfire with the white station wagon, the Avenue Gang "homeboys" fired several shots at the residence of Lucas Nobregas, 515 Jeffries. Two of the Nobregas sons are members of the Cypress Park Gang. Significantly, Nobregas testified sev-

eral people were firing guns from the green station wagon. The front passenger was shooting what appeared to be a rifle. Shotgun fire came from both sides of the rear seat. Bullets as well as shotgun pellets struck Nobregas' house. (This version, of course, conflicts with appellant's statement they only had one shotgun along in the green station wagon and that all the shots were fired by one person.) Nobregas returned fire with his own weapon as the car passed his house and out of sight.

After reloading the shotgun (and any other weapons they actually may have had), the Avenue Gang "homeboys" turned around and headed back down Jeffries. Again they passed near 515 Jeffries and fired shots at Nobregas' house. The white station wagon reappeared. The occupants of the two cars exchanged gunfire again. Caesar Salas, the Avenue Gang "homeboy" in the front passenger seat, was shot in the neck. The others took him to L.A.C.S.C. General Hospital and drove away. A hospital security guard noted the license number of the green station wagon and phoned the police. Shortly thereafter, Salas died of the wound. The police quickly located the appellant and his companion. Fernando R. gave a voluntary statement admitting most of the events of the evening of December 20-21, 1982.

In an amended petition, Fernando R. and Aurelio R. were charged with murder and use of a firearm (count I, violation of Pen. Code, §§ 187, 12022, subd. (a), 12022.5) and conspiracy to commit murder and assault with a deadly weapon (count II, violation of Pen. Code, § 245, subd. (a)(1)). Trial began in juvenile court on February 8, 1983. The evidence against these two juveniles consisted primarily of their voluntary statements and Nobregas' testimony. The court found Fernando R. had committed murder in the second degree involving use of a firearm and conspiracy to commit assault with a deadly weapon. It acquitted him of personal use of a firearm and conspiracy to murder. Fernando R. was declared a ward of the court and committed to physical confinement for a maximum term of fifteen to life for murder, an additional year for the involvement of a firearm, and four years for conspiracy to assault with a deadly weapon. The four-year term is to run concurrently with the sixteen to life.

Fernando R. appeals primarily on grounds the evidence does not support his conviction of "vicarious murder" of his fellow gang member, Caesar Salas. However, in his letter in lieu of reply brief he incorporated Aurelio R.'s brief challenging the "vicarious murder" doctrine itself.

II. The "Vicarious Murder" or "Provocative Act Murder" Doctrine Has Just Been Reconsidered and Upheld by the California Supreme Court

In a decision too recent to be briefed by either party, the California Supreme Court has refused to abandon or narrow California's nearly unique

invention—what some call "vicarious murder" but which perhaps more accurately might be termed "provocative act murder."[1] This opinion, *People v. Caldwell* (1984) 36 Cal.3d 210 [203 Cal.Rptr. 433, 681 P.2d 274], was only filed June 14, 1984, and the petition for rehearing was not denied until less than a month before oral argument in the instant case. The appellants in *Caldwell* asked the Supreme Court "fundamentally to reconsider the *Washington-Gilbert* doctrine of liability for killings committed directly by persons other than the cofelons, . . ." (36 Cal.3d at p. 222.) The court responded to this invitation by expressly upholding this doctrine. Thus we have no reason to confront the issue anew.

III.  ██ ██  THE APPELLANT IN THIS CASE WAS PROPERLY CONVICTED UNDER THE "PROVOCATIVE ACT MURDER" DOCTRINE

██  In the usual murder, the defendant intends to kill a certain victim and personally fires the bullet—or commits the other life-threatening act—which kills that victim. In a "vicarious murder" the defendant and his confederate or confederates all have an intent to kill but it is someone other than the defendant who fires the fatal shot.  ██ ██ ██ ██ ██  In a "felony murder" the defendant and his cohorts need not begin the enterprise with any intent to kill anyone; on the other hand, they do share an intent to commit a felony where death is foreseeable and one of them ends up killing some third party.[2]  ██  A "provocative act" murder is yet another breed. Here neither the defendant nor his accomplices intend to kill the victim. Nor indeed do any of them pull the trigger. Instead it is a third person who actually fires the fatal bullet and it is one of the defendant's accomplices or occasionally an innocent bystander who ends up as the dead victim.  ██ To satisfy the "actus reus" element of this crime the defendant or one of his confederates must commit an act which provokes a third party into firing the fatal shot. To satisfy the "mens rea" element, the defendant or his confederate must know this act has a "high probability" not merely a "foreseeable possibility" of eliciting a life-threatening response from the third party.

---

[1]Appellant's brief also refers to this as the "proximate cause" or "implied malice/provocative conduct" theory of murder. Whatever name is used, this theory has been rejected in several jurisdictions. (See, e.g., *Commonwealth* v. *Redline* (1958) 391 Pa. 486 [137 A.2d 472]; *Commonwealth* ex. rel. *Smith* v. *Myers* (1970) 438 Pa. 218, [261 A.2d 550, 56 A.L.R.3d 217]; *Alvarez* v. *District Ct. in & for City & Cty. of Denver* (1974) 186 Colo. 37 [525 P.2d 1131]; *People* v. *Wood* (1960) 8 N.Y.2d 48 [201 N.Y.S.2d 328, 167 N.E.2d 736]; *State* v. *Garner* (1959) 238 La. 563 [115 So.2d 855]; *State* v. *Harrison* (1977) 90 N.M. 439 [564 P.2d 1321]; *People* v. *Austin* (1963) 370 Mich. 12 [120 N.W.2d 766]; *Sheriff, Clark County* v. *Hicks* (1973) 89 Nev. 78 [506 P.2d 766]. But see *Blansett* v. *State* (Tex.Crim. 1977) 556 S.W.2d 322.)

[2]In California, to qualify as a felony murder the fatal act must have been committed "by the defendant or by his accomplice acting in furtherance of their common design." (*People* v. *Washington* (1965) 62 Cal.2d 777, 783 [44 Cal.Rptr. 442, 402 P.2d 130].)

■ The classic statement of the elements of the "provocative act" murder is found in *People* v. *Gilbert* (1965) 63 Cal.2d 690 [47 Cal.Rptr. 909, 408 P.2d 365], revd. on other grounds (1967) 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]: "When the defendant or his accomplice, with a conscious disregard for life, intentionally commits an act that is likely to cause death, and his victim or a police officer kills in reasonable response to such act, the defendant is guilty of murder. In such a case, the killing is attributable, not merely to the commission of a felony, but to the intentional act of the defendant or his accomplice committed with conscious disregard for life.

"Thus, the victim's self-defensive killing or the police officer's killing in the performance of his duty cannot be considered an independent intervening cause for which the defendant is not liable, for it is a reasonable response to the dilemma thrust upon the victim or the policeman by the intentional act of the defendant or his accomplice. [Citations omitted.]" (63 Cal.2d at pp. 704-705.)

The very recent California Supreme Court case mentioned earlier—*People* v. *Caldwell, supra,* 36 Cal.3d 210—followed the typical scenario of a "provocative act" murder. Three men robbed a Church's Fried Chicken outlet. They were pursued by several law enforcement vehicles over "a twisting course for 5 to 10 miles, at speeds up to 70 miles per hour." Ultimately, the robbers were cornered. The one in the front passenger seat pointed a shotgun at the nearest sheriff's vehicle. "Instinctively, Deputy Hunter accelerated and rammed the suspects' car head-on. The shotgun discharged and flew out of [the defendant's] hands, skidding away from the auto." The robber in the rear seat brandished a pistol at the police and refused to drop the weapon when ordered to do so. Meanwhile the driver crouched behind the open car door and appeared also to be armed. When the three robbers refused to give up or surrender their weapons, the police opened fire. The rear seat passenger who had brandished the pistol was fatally wounded. The driver and front seat passenger were both convicted of his murder on grounds their acts had provoked the police fire which killed their accomplice.

Most of the other "provocative act" murder cases decided by California appellate courts have involved essentially the same basic fact pattern. Criminals escaping the scene, pursued by law enforcement officers, commit some act which provokes the police to kill one of their number. (See, e.g., *People* v. *Washington, supra,* 62 Cal.2d 777; *People* v. *Gilbert, supra,* 63 Cal.2d 690.) There is language in several of these opinions suggesting criminal culpability under this doctrine depends on the defendant—or one of his cohorts—intending to commit and indeed committing an act over and above

the underlying felony itself. Moreover, this additional and independent act must be one which in all probability will provoke a third party to retaliate in a life-threatening manner. (See, e.g., *In re Joe R.* (1980) 27 Cal.3d 496, 505 [165 Cal.Rptr. 837, 612 P.2d 927]; *People* v. *Gilbert, supra,* 63 Cal.2d 690, 704.) This implication also appears in the Supreme Court's recent *Caldwell* decision (36 Cal.3d 210). "The fact that subtle distinctions sometimes have to be made in deciding whether conduct goes beyond commission of the underlying felony [citations omitted] does not require us to jettison the doctrine; certainly defendants' suggestion that their own conduct did not go beyond commission of a robbery requires no discriminating analysis." (*Id.,* at p. 223.)

In these police chase situations the provocative act usually consists of shooting at pursuing officers or threatening them with a weapon. Thus neither the underlying robbery or other felony nor the mere act of fleeing from the police will itself satisfy the "provocative act" element of this crime.

The instant case differs significantly from these police chase cases where most of the law of "provocative act" murder has evolved. Here there was no act over and above the felony these juveniles originally intended to commit which induced a third party to kill one of their number. They drove into a rival gang's territory with the specific intent of shooting a member of that gang. They fired at a car—and perhaps a house—they had every reason to believe contained gang members they had come to shoot. The occupants of the car shot back killing one of the juveniles. But this was a natural and "highly probable" reaction to the felony they originally intended to and did commit, that is, shooting a member of a rival juvenile gang. Accordingly, if the "provocative act" indeed must be something other than the underlying felony it is hard to bring these defendants within the compass of this doctrine.

However, there are felonies and there are felonies. The requirement of an independent provocative act has grown up in the context of felonies which do not themselves inherently involve an intent to kill. For instance, the three men who robbed the Church's Fried Chicken dinner outlet in the *Caldwell* case planned to use their guns to threaten the employees into surrendering the cash. True, they ran some risk they might have to actually fire those weapons in order to achieve their objective, but they did not necessarily intend to shoot anyone. If all went according to plan, no one would have been hurt and they would have been a few hundred dollars richer. Good reasons exist to require these robbers to do something further before they can be held accountable for a death resulting from a third person's bullet. Without that additional intentional and provocative act, the defendants lack the necessary state of mind—an intent to kill or at least an

intent to commit life-threatening acts. Moreover, by holding them responsible for murder only if they do something beyond the underlying felony we encourage felons to halt the cycle of violence before someone is killed. For instance, if the defendants in *Caldwell* had surrendered themselves and their weapons rather than seeking to resist they would not have been liable for the death of their confederate even if he somehow had been killed by the police during the chase.

In the instant case, however, the felony the appellant and his fellow gang members undertook to commit involved an intent to kill. They did not enter Cypress Hill territory to rob a chicken restaurant hoping to escape with some money but without firing a shot. Rather they drove in there for the specific purpose of shooting and possibly killing someone. Thus there is no danger we are punishing an innocent mind if we convict them for a death which resulted when their plans misfired. Beyond that, their intentional felony was itself a "provocative act," that is, it was a crime which was likely to provoke others to shoot back and perhaps kill one of the cofelons. The appellant and his fellow Avenue Gang members knew their targets—members of the Cypress Hill Gang—were armed. There was a high probability if they shot at these rival gang members the latter would shoot back. Thus the appellant and his confederates set out to commit a felony which in and of itself comprised a "provocative act."

Accordingly, under the circumstances of this case, we hold no separate and independent "provocative act" need be committed. The felony the appellant intended to and did commit satisfies that element of this specie of murder. He and his fellow gang members went into this with an intent to commit acts which were likely to cause someone else's death and with knowledge there was a high probability of retaliatory gunfire which might strike or even kill one of their own. Thus they provoked the acts which killed their accomplice just as surely as if they had started a firefight with law enforcement officers which produced the same death. Those who create these situations are as morally culpable if one of their own dies in the ensuing gun battle as if they succeed in killing a rival gang member or a police officer. Moreover, society has an interest in deterring people from initiating these deadly confrontations—gang warfare as well as shootouts with the police. More people will be deterred if they know when the smoke clears they will be held accountable for all the dead bodies, friend or foe alike.

■ For these reasons, it is irrelevant whether Fernando R. actually fired a weapon at the rival gang's automobile. At a minimum he was an active accomplice in the commission of the provocative act which led to the death of their fellow gang member. Indeed he actually drove the vehicle

used to invade the Cypress Park Gang's territory in search of a rival gang member to shoot. He is morally culpable for that act and the reaction it provoked. Thus, the evidence is sufficient to support his conviction for the murder of Caesar Salas.

### DISPOSITION

The judgment is affirmed with respect to appellant Fernando R. Inasmuch as the superior court has vacated the underlying adjudication and disposition against appellant Aurelio R. on grounds unrelated to this appeal, his appeal is dismissed as moot.

Lillie, P. J., and Thompson, J., concurred.

The petition of appellant Fernando R. for review by the Supreme Court was denied July 10, 1985.