[No. E015983. Fourth Dist., Div. Two. Apr. 21, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
EDWARD ALVARADO GALLEGOS, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 1.b., 1.c., 1.d., 1.e., 1.f. and 2.

## COUNSEL

Charles R. Khoury, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Frederick B. Clark, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RAMIREZ, P. J.**—A jury convicted Edward Alvarado Gallegos of second degree murder (Pen. Code, § 187), willful, deliberate and premeditated attempted murder (Pen. Code, §§ 664, 187), possession of heroin (Health & Saf. Code, § 11350)[1] and six counts of assault with a handgun (Pen. Code, § 245, subd. (a)(1)). The jury further found that during all the nondrug offenses, Gallegos had used a handgun. (Pen. Code, § 12022.5.) He was sentenced to prison for 15 years to life, with a consecutive life term, and appeals, claiming jury instruction error and insufficiency of the evidence. We reject all his contentions, save his insufficiency of the evidence argument as to three of the assaults.

### FACTS

On January 24, 1992, Gallegos was among a crowd of hundreds at a Coachella nightclub where a Tejano singer and his band were performing. Gallegos, who was standing inches from the stage at the front of the very crowded dance floor, leapt up onto the stage, pulled out a .25-caliber handgun, approached the singer and began firing from about three feet away, hitting him in the upper body. The singer, hereinafter referred to as the attempted murder victim, tried to run from Gallegos, who continued to fire at him. The attempted murder victim pulled out a 10-millimeter handgun he had placed in his waistband just before beginning his performance and fired once at Gallegos. The gun malfunctioned, and the attempted murder victim threw it at Gallegos, hitting him in the face with it. Gallegos eventually ended up on the dance floor, where he continued to shoot until he was subdued by other patrons there. When the shooting was over, one patron (hereinafter referred to as the murder victim), who had been dancing with his wife on the dance floor, lay dead from a bullet wound, and his wife had been shot, as had a member of the band and four other patrons.

---

[1]The trial court dismissed this count at sentencing.

## Issues and Discussion

### 1. *Jury Instruction*

#### a. *Provocative Act Murder*

■ The jury was instructed as to the elements of the provocative act theory of murder, upon which the People were relying, as follows:

"1.   The crime of attempted murder [or] its lessor [*sic*] included crimes listed elsewhere in these instructions was committed; and

"2.   *During the commission of such crime, a person committing the crime also intentionally committed a provocative act*; and

"3.   The provocative act was deliberately performed with knowledge of the danger to and with conscious disregard for human life; and

"4.   Such act was sufficiently provocative that the intended victim of the attempt[ed] murder or its lessor [*sic*] included crimes in a reasonable response thereto killed a third person." (Italics added.)

The trial court refused to give the following instruction proffered by the defense: "The life[-]threatening act on which the implied malice liability is premised must be something beyond the underlying felony itself, the attempted murder, and must be a proximate cause of death." Gallegos now claims the trial court's refusal to give this instruction warrants reversal of his conviction for the murder. We disagree.

First of all, the proffered instruction, as worded, and although taken from *In re Joe R.* (1980) 27 Cal.3d 496, 505 [165 Cal.Rptr. 837, 612 P.2d 927],[2] would have confused this jury by its reference to "[t]he life[-]threatening act[,]" a phrase which had not been used in any of the other instructions given. This would have left the jury wondering what "life-threatening act" this instruction meant. Of course, those well versed with *In re Joe R.* and other similar provocative act cases know that "the life-threatening act" is the provocative act, but this jury could not have been expected to make the connection without assistance, which the proffered instruction did not provide.

Aside from this matter looms the larger problem addressed by Gallegos, i.e., that the proffered instruction made clearer than the instruction given that

---

[2]The reference in the proffered instruction to attempted murder was added by Gallegos. *In re Joe R.* involved a robbery. .

the provocative act had to be independent of the attempted murder. The People correctly point out that CALJIC No. 8.12 *implies* by its requirement that the defendant "*also* intentionally commit . . . a provocative act . . . [d]uring the commission of" (italics added) the attempted murder, that the provocative act be something beyond the underlying felony itself. Indeed, the prosecutor, in his argument, reminded the jury of this, contending that Gallegos's acts of jumping up on the stage, approaching the attempted murder victim, pulling out his gun, aiming it at the attempted murder victim and firing it were provocative acts upon which the jury could imply the malice necessary for murder. The simple truth, however, is that those acts were essential parts of the attempted murder itself; therefore, they could not have been "something beyond the underlying felony itself."

So, what of this requirement that the provocative act(s) be independent of the underlying felony? Contrary to Gallegos's claim, *In re Joe R.* did not declare this to be the law. It was done 15 years earlier, in *People* v. *Washington* (1965) 62 Cal.2d 777 [44 Cal.Rptr. 442, 402 P.2d 130]. In *Washington*, the California Supreme Court concluded that a robber's cohort approaching the robbery victim, while pointing a loaded gun at him, was an insufficient basis upon which the jury could imply to the robber the malice necessary for murder when the victim shot and killed the cohort. The court stated its rationale thusly: "In every robbery there is a possibility that the victim will resist and kill. The robber has little control over such a killing once the robbery is undertaken as this case demonstrates. To impose an additional penalty for the killing would discriminate between robbers, not on the basis of any difference in their own conduct, but solely on the basis of the response by others that the robber's conduct happened to induce." (*Id.* at p. 781.)

There is other important language in *Washington* pertinent to our analysis. In setting forth the various means by which a defendant may be held criminally responsible for a death caused by another, the Supreme Court commented that a defendant may be liable as a conspirator, as an aider and abettor or as one who uses another to kill. The final means of attaching criminal responsibility in such a situation was stated by the Supreme Court thusly: "Defendants who initiate gun battles may also be found guilty of murder if their victims resist and kill. Under such circumstances, 'the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death.' [Citation.] . . ." (*People* v. *Washington, supra,* 62 Cal.2d at p. 782.)

This latter point was reiterated in *People* v. *Gilbert* (1965) 63 Cal.2d 690, 703 [47 Cal.Rptr. 909, 408 P.2d 365], in the context of a gun battle initiated

by a robber while attempting to escape from the robbery scene, during which a police officer killed the defendant's cohort. However, the problem in *Gilbert* was that the jury had not been given the opportunity to determine if the cohort had been "killed in response to a shooting initiated by [the defendant] . . . or solely to prevent the [defendant and his cohort from escaping with the spoils of the ] robbery." (*Id.* at pp. 703-704.) If the killing had been a result of the defendant's "initiation of gunplay" (*People* v. *Reed* (1969) 270 Cal.App.2d 37, 46 [75 Cal.Rptr. 430]), malice sufficient for murder could have been implied. (*People* v. *Gilbert, supra,* 63 Cal.2d at p. 704; 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against the Person, § 478, p. 539.)

Whether the defendant had initiated a gun battle became a pivotal issue in *Taylor* v. *Superior Court* (1970) 3 Cal.3d 578 [91 Cal.Rptr. 275, 477 P.2d 131], overruled on other grounds in *People* v. *Antick* (1975) 15 Cal.3d 79, 92, footnote 12 [123 Cal.Rptr. 475, 539 P.2d 43], the next California Supreme Court case to discuss provocative act murder. Crucial to the outcome, held the court, was whether threats by one of the defendants towards one of the robbery victims and the defendants' cohort's pointing a gun at the victim while looking "apprehensive" and "intent" were sufficient to constitute the initiation of the gun battle that followed between both robbery victims and the cohort, during which the cohort was killed. Citing two cases which did not even explore whether the provocative acts were independent of the underlying felony,[3] the California Supreme Court made the same omission and held that the acts constituted sufficient evidence that

---

[3]The Supreme Court cited *People* v. *Reed, supra,* 270 Cal.App.2d 37, and *Brooks* v. *Superior Court* (1966) 239 Cal.App.2d 538 [48 Cal.Rptr. 762]. In *Reed,* after relieving a gas station attendant of some of the station's money, the defendant forced him, at gunpoint, to get into a car. When officers approached, the defendant pointed his gun in their direction and in the direction of the robbery victim. Officers shot at the defendant in response, accidentally killing the victim. The Court of Appeal cited *Gilbert,* saying, ". . . malice may be established when a defendant initiates a gun battle, and under such circumstances he may be convicted of murder for a killing committed by another during such a battle." (*People* v. *Reed, supra,* 270 Cal.App.2d at pp. 44-45.) The court went on to hold that a defendant need not fire the first shot in order to be considered to have initiated a gun battle. To hold otherwise, concluded the court, would be to unreasonably require the officer to give the defendant "the courtesy of the first shot." (*Id.* at p. 45.) In *Brooks,* which did not involve a robbery, the defendant used foul language concerning a police officer who approached his car during the Watts riots after the defendant had failed to heed the officer's command to leave the area. The defendant then placed his hand over the midsection of the officer's shotgun. The officer, fearing the defendant was attempting to disarm him, pulled back on his gun, and it accidentally discharged, killing another officer. Citing *Gilbert,* the Court of Appeal concluded that the evidence was sufficient to support an indictment for murder, as the defendant's placing his hand on the officer's gun, under the circumstances, "was fraught with grave and inherent danger to human life." (*Brooks* v. *Superior Court, supra,* 239 Cal.App.2d at p. 540.)

the defendants had " 'initiate[d]' the gun battle" and were thus liable for their cohort's death. (*Taylor* v. *Superior Court, supra*, 3 Cal.3d at p. 584.)[4]

Holding that "[i]nitiating a gun battle is not the only means of manifesting malice[,]" *Pizano* v. *Superior Court* (1978) 21 Cal.3d 128, 136 [145 Cal.Rptr. 524, 577 P.2d 659], the next California Supreme Court case to address provocative act murder, concluded that a robber using his victim as a shield to effect his escape constituted a sufficient basis upon which to infer malice for the accidental killing of the victim by a third party who was attempting to foil the robbery and did not realize that the victim was present. The court rejected the defendant's attempt to have his criminal liability determined solely on the basis of the shooter's state of mind that he was reacting to the robbery, rather than to the use of the victim as a shield. Instead, the court held, the question should be whether the accidental shooting of the victim was proximately caused, on an objective basis, by the provocative acts of the robber in using him as a shield.

The California Supreme Court's next stab at provocative act murder, *In re Joe R., supra*, 27 Cal.3d 496, upon which Gallegos relies, was, as the People correctly point out, a sufficiency of the evidence case. There, the court concluded that the defendant's provocative acts during a robbery were an inadequate basis for implying malice because they did not provoke the victim's lethal response and, therefore, did not proximately cause the death of one of the defendant's cohorts. The Supreme Court distinguished *In re Tyrone B.* (1976) 58 Cal.App.3d 884 [130 Cal.Rptr. 245] and *People* v. *Velasquez* (1975) 53 Cal.App.3d 547 [126 Cal.Rptr. 11] on the basis that "[e]ach involved a deadly assault *initiated* in part by defendant, which predictably produced lethal resistance from the victim." (*In re Joe R, supra*, 27 Cal.3d at p. 507, italics original.) In *Tyrone B.*, the minor and his cohort assaulted their attempted robbery victim, who responded by fatally shooting the cohort. Without discussing whether the assaultive conduct was independent of the attempted robbery, the court cited *Washington* and *Gilbert* for the proposition that "[w]here a defendant, with a conscious disregard for life, intentionally commits an act likely to cause death, and his victim kills in a reasonable response to such act, the defendant is guilty of murder." (*In re Tyrone B., supra*, 58 Cal.App.3d at p. 888.) In *Velasquez*, the defendant and

---

[4]*Taylor* did not escape criticism, both from those who dissented from it and from others, due to its seemingly factual inconsistency with *Washington* and its sidestepping of the requirement established by *Washington* and *Gilbert*, and their progeny, that the provocative acts be independent of the underlying robbery. (*Taylor* v. *Superior Court, supra*, 3 Cal.3d at pp. 585-594 (separate dis. opns. by Peters, J., and Mosk, J.); see also Note, *Criminal Responsibility for the Death of a Co-Felon: Taylor* v. *Superior Court of Alameda County* (1971) 7 Cal. Western L.Rev. 522; The Supreme Court of California 1970-1971: Criminal Law (1972) 60 Cal.L.Rev. 856; but cf. *In re Joe R., supra*, 27 Cal.3d at p. 505.)

his brother assaulted two police officers as part of the defendant's efforts to resist being arrested by the officers. One of the officers shot and killed the brother. The Court of Appeal concluded that malice could be implied. It did not even discuss whatever independence there could have been between the provocative acts of assault and the underlying felony of resisting arrest. Of course, there was none.[5]

Although cases involving deaths resulting from robberies have continued to adhere to the requirement that the provocative act be independent of the robbery (see, e.g., *People* v. *Kainzrants* (1996) 45 Cal.App.4th 1068 [53 Cal.Rptr.2d 207]), the above discussed authorities and logic dictate a different approach when the underlying offense is attempted murder, such as here. This approach was first declared in *In re Aurelio R.* (1985) 167 Cal.App.3d 52 [212 Cal.Rptr. 868]. Therein, the minor and his fellow gang members drove into rival gang territory, armed and intent upon shooting a rival member as revenge for an earlier attack on one of their own. They shot into a house where they believed two members of the rival gang lived and initiated an exchange of gunfire with a car occupied by members of the rival gang. During the melee, one of the minor's cohorts was killed.

The Court of Appeal began its discussion of provocative act murder by noting, "To satisfy the 'actus reus' element of this crime the defendant . . . must commit an act which provokes a third party into firing the fatal shot. To satisfy the 'mens rea' element, the defendant . . . must know this act has a 'high probability' not merely a 'foreseeable possibility' of eliciting a life-threatening response from the . . . person who actually fires the fatal bullet . . . ." (*In re Aurelio R., supra*, 167 Cal.App.3d at p. 57.)

*Aurelio R.* went on to state, "The instant case differs significantly from [cases involving police chases following robberies] where most of the law of 'provocative act' murder has evolved. Here there was no act over and above the felony these juveniles originally intended to commit which induced a third party to kill one of their number. They drove into a rival gang's territory with the specific intent of shooting a member of that gang. They fired at a car—and perhaps a house—they had every reason to believe contained gang members they had come to shoot. The occupants of the car

---

[5]Nor was there any in *People* v. *Claflin* (1978) 87 Cal.App.3d 1 [150 Cal.Rptr. 693]. Therein, the defendant and his cohorts got in an angry exchange with off-duty police officers. After realizing one of the officers was armed, the defendant and company left, but returned with their own weapons and charged the officers. In the melee, one of the defendant's cohorts was killed. Again, without noting that there could be no independence whatsoever of the provocative acts, which were the assaults, from the assaults, the Court of Appeal, in reliance upon *Tyrone B.* and *Velasquez*, reversed the trial court's order dismissing the order setting aside the charges.

shot back killing one of the juveniles. But this was a natural and 'highly probable' reaction to the felony they originally intended to and did commit . . . . Accordingly, if the 'provocative act' indeed must be something other than the underlying felony it is hard to bring these defendants within the compass of this doctrine. [¶] However, . . . [t]he requirement of an independent provocative act has grown up in the context of felonies which do not themselves inherently involve an intent to kill. . . . [Robbers] r[u]n some risk they might have to actually fire th[eir] weapons in order to achieve their objective, but *they [do] not necessarily intend to shoot anyone.* If all [goes] according to plan, no one [has to get] hurt and they [get the money]. Good reasons exist to require these robbers to do something further before they can be held accountable for a death resulting from a third person's bullet. Without that additional intentional and provocative act, the defendants lack the necessary state of mind—an intent to kill or at least an intent to commit life-threatening acts. Moreover, by holding them responsible for murder only if they do something beyond the underlying felony we encourage felons to halt the cycle of violence before someone is killed. . . . [¶] In the instant case, however, the felony the appellant and his fellow gang members undertook to commit involved an intent to kill. . . . [T]hey drove in[to rival gang territory] for the specific purpose of shooting and possibly killing someone. Thus there is no danger we are punishing an innocent mind if we convict them for a death which resulted when their plans misfired. Beyond that, their intentional felony was itself a 'provocative act,' that is, it was a crime which was likely to provoke others to shoot back and perhaps kill one of the cofelons. . . . Thus, the appellant and his confederates set out to commit a felony which in and of itself comprised a 'provocative act.' [¶] Accordingly, under the circumstances of this case, we hold no separate and independent 'provocative act' need be committed. The felony the appellant intended to and did commit satisfies that element of this specie of murder." (*In re Aurelio R., supra,* 167 Cal.App.3d at pp. 59-60, italics original.)

The holding of the court in *Aurelio R.* not only has tremendous logical appeal, but it is entirely consistent with language in most of the cases cited above concerning liability when a defendant initiates gunplay.

The jury here necessarily found, under the instructions given, that "the natural consequences of" Gallegos's shooting at the attempted murder victim "[were] dangerous to human life," the shooting was "deliberately performed with knowledge of the danger to and with conscious disregard for human life" and was "sufficiently provocative that the [attempted murder] victim . . . in a reasonable response thereto killed [the murder victim]" and the shooting "was a cause of that death." Certainly, the facts justify such findings—Gallegos was in an extremely crowded dance hall, jumped up on

the slightly elevated stage crowded with band members, which was inches from patrons dancing on the floor, began shooting at the attempted murder victim, and continued to do so after the latter jumped off the stage and was trying to leave the hall, and even while Gallegos was on the dance floor and was being subdued by other patrons. This satisfies both the "actus reus" and "mens rea" elements of provocative murder, as set forth in *Aurelio R.* As in *Aurelio R.*, there was a "high probability" under the circumstances that Gallegos's shooting would elicit a life-threatening response from the attempted murder victim, or from anyone else present, for that matter.

b.-f.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

2. *Insufficiency of the Evidence**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

Gallegos's convictions for assault with a firearm in counts III, IV and VIII are reversed. The trial court is directed to amend the abstract of judgment to reflect this fact and to strike the concurrent terms for each of those counts. In all other respects, the judgment is affirmed.

Hollenhorst, J., and Ward, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 30, 1997. Kennard, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante,* page 453.