[No. B153751. Second Dist., Div. Seven. Feb. 25, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
VARTAN KARAPETYAN, Defendant and Appellant.

610

**COUNSEL**

Geragos & Geragos, Mark Geragos and George W. Buehler for Defendant and Appellant.

■■■■■■■■■■■■■■■■■

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, and Susan Sullivan Pithey, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**MUNOZ, J.***—Following a shootout in the streets of Los Angeles in which two people were killed, appellant, Vartan Karapetyan, was charged with two counts of murder (Pen. Code, § 187, subd. (a)) and one count of conspiracy to commit murder. (Pen. Code, § 182, subd. (a)(1).) In each of the murder counts, appellant was charged with having personally used a firearm. (Pen. Code, § 12022.5.) Additionally, the second count charged appellant with the special circumstance of multiple murders. (Pen. Code, § 190.2, subd. (a)(3).)

A jury found appellant guilty of two counts of second degree murder while personally using a firearm. (Pen. Code, §§ 189, 12022.5.) Appellant was sentenced to concurrent terms of 15 years to life for each murder plus an additional term of 10 years for having personally used a firearm in the commission of the offenses. The appeal is from the judgment.

The only issue raised by appellant is the court's removal of a juror after the jury had been deliberating for more than five days.

## I. *Procedural Facts at Trial.*

Trial commenced on May 2, 2000, with a trial estimate of 19 days and an intended completion date of May 26, 2000. The trial was completed within the scheduled time and jury deliberations commenced on May 24, 2000.

On May 26 two jurors sent a note to the court indicating they were having problems with their employers regarding payment for jury service. In a conference outside of the presence of the other jurors, the court notified both jurors what it had done to get them paid while they continued to deliberate. Upon hearing this information, both jurors indicated they would stay on the case until completion with one juror specifically stating she was even willing to use her vacation days to stay on the case. The jury was then allowed to separate for the weekend. After returning from the weekend, the jury continued to deliberate on May 30 and May 31.

The next court day, June 1, 2000, started with a note from the foreperson, Juror No. 6, indicating Juror No. 12 wanted to know "if shooting a gun in the

---

*Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

air within city limits is a crime." The court answered by giving a lengthy answer, which included the following sentence: "Shooting a gun in the air, depending upon what you find to be all the attending circumstances may or may not constitute a crime." The answer was apparently then submitted to the jury in written form off the record.

At 2:40 p.m. of the same date, the court received a note from four jurors lodging complaints against Juror No. 12. The complaints ranged from questions about Juror No. 12's bias, to charges his actions constituted juror misconduct and a refusal to further deliberate. The jury foreperson wrote, "We do not know what to do."

The foreperson, Juror No. 6, also sent a separate note stating "Juror Number 6 is unable to proceed with case if we have to start it and deliberate again. As you know, I have been here unpaid from my job since the 15th of May. We had an [sic] 12 count unanimous vote and the verdict were [sic] signed when out of the blue Juror Number 12 change [sic] his mind again. Now we are stuck due to not being paid. This is becoming a hardship on me and my family."

After conferring with counsel, the court indicated it was going to speak to the jurors about the misconduct claims and would eventually speak to Juror No. 12.

The jurors were then brought out individually for questioning by the court. The following summarizes each questioned juror's responses.

*Juror No. 4*: Juror No. 12 had stated many times, "I don't want to hang the guy, I don't want to hang the guy." Juror No. 12 had also called his fellow jurors "a lynch jury." When the court failed to give a "yes" or "no" answer to the inquiry about firing a gun within the city limits, Juror No. 12 had stated "that was his way out." Juror No. 12 was unable to understand what he read, had problems remembering the facts and was bringing into the deliberations what he had seen on television. Juror No. 4 also thought Juror No. 12 had made references to religion, but he could not say for sure. At that point the court allowed counsel to question the jurors.[1]

*Juror No. 2*: He had heard Juror No. 12 say, "All of these people are criminals. We should put them all up against the wall and shoot them."

---

[1] In a case subsequent to the date of this trial, the Supreme Court stated, "We also observe that permitting the attorneys for the parties to question deliberating jurors is fraught with peril and generally should not be permitted." (*People v. Cleveland* (2001) 25 Cal.4th 466, 485 [106 Cal.Rptr.2d 313, 21 P.3d 1225].)

However, Juror No. 12 was also heard to state the jury was trying to "lynch this person" and that "he doesn't want any responsibility for putting anyone in jail." After the court's answer to the inquiry about shooting a gun within the city limits, Juror No. 12 was heard to state "This is my way out." Juror No. 12 had, generally speaking, been a difficult juror who fought every single thing on every single issue and would then change his mind. In response to a question by the court, Juror No. 2 stated that Juror No. 12 had indicated his religious beliefs would not allow him to convict another person. Additionally, Juror No. 12 seemed to have even more problems with the jury instructions than the other jurors. He seemed to want "to dissect every single word" and "wants legal interpretation for every single word." He had also heard Juror No. 12 state that his religious beliefs wouldn't allow him to judge and convict another person. That comment had only been made once.

*Juror No. 1*: Juror Number 12 seemed to try, but he could not make the simplest of decisions. When asked specific questions, Juror No. 12 would answer in rhetoric. When the court had answered the jury's question, Juror No. 12 stated, "Well, that's it. I can't change my mind from here." He had made the comment that he was glad there would be no capital punishment. Finally, Juror No. 12 had indicated he would like to take the instructions home and get a dictionary. In summation Juror No. 1 stated, "I do not think the man is a troublemaker. I think he's making an honest attempt. I do not believe he can get there, and he appears to be in a great deal of agony."

*Juror No. 5*: The misconduct he had heard Juror No. 12 commit was the lynch mob comment. Juror No. 12 had also stated he felt the other jurors were confused or convinced the defendant was guilty. Juror No. 12 had also mentioned something about the death penalty, but Juror No. 5 could not recall what was said. Juror No. 12 also made the statement that he couldn't come to a decision because of his religious beliefs. In Juror No. 5's opinion, Juror No. 12 was "going off the pamphlet" and discussing different laws and factual situations. He also made reference to the television shows like *Cops* and had also brought up the O.J. Simpson case. Juror No. 12 seemed to be confused with the instructions and expressed a desire to take them home and seemed to want more information from library books. Juror No. 12 also appeared to be under stress. Finally, in response to the prosecutor's question, Juror No. 5 stated Juror No. 12 was participating in the deliberations.

*Juror No. 3*: She resented being referred to as part of a lynch mob. However, after the court had instructed the jurors to resume deliberations in a spirit of mutual respect, Juror No. 12 explained to his fellow jurors why he made the comment and that he was just trying to make sure that the other

jurors did not make the wrong decision. In her opinion, Juror No. 12 did not understand the instructions and "ad libbed" the instructions and the evidence. Juror No. 12 discussed movies and television in the course of deliberations. Just before lunch, on the same day as the hearing, Juror No. 12 had made the comment that "his religion won't let him be a fair judge as far as guilty and not guilty." In general, Juror No. 12 had a different view of the evidence and felt as if everyone was against him.

*Juror No. 6 (the jury foreperson)*: After the court had answered the question about shooting a gun in the air she had told Juror No. 12, "You know, you got to shut up now." At that point Juror No. 12 changed his vote. When asked about Juror No. 12's ability to understand the instructions, she responded "He don't understand nothing." She had also heard Juror No. 12 state he wanted to go to the library in Montebello and take the instructions home. She had told Juror No. 12 he couldn't do it. In her opinion, Juror No. 12 did not have a clue what the case was about, nor was he capable of making a decision on his own. He made so many references to movies that she finally had to tell him, "I don't want to hear nothing else about no movie."

*Juror No. 7*: He felt that what was happening was disagreement, not misconduct. Juror No. 12 was incapable of sticking to a position. Even when he agreed with something he would change his mind within 10 to 20 seconds. However, Juror No. 12 was participating in the deliberations.

*Juror No. 8*: Juror No. 12 had stated it was natural for society to require people to judge other people. In Juror No. 8's opinion, however, Juror No. 12 was unsure as to whether he could judge. The reference to movies by Juror No. 12 was due to Juror No. 12's not having much experience in seeing things while he was growing up. Insofar as the jury instructions were concerned, Juror No. 12 had problems in that "[h]e needs to hear the other jurors first or have the other jurors explain to him what the other jurors believe before he can bring himself to make a decision." Although Juror No. 8 personally felt Juror No. 12 could not make a decision, Juror No. 12 had stated to her, "that he could bring himself to judge other people."

*Juror No. 9*: Juror No. 12 was a religious man who had led a sheltered life and had trouble making up his mind. Most of his experience had been with television and movies. Juror No. 9 also felt that Juror No. 12 was too naive for jury duty. In regard to the instructions, Juror No. 12 was the only person having trouble understanding the instructions.

*Juror No. 10*: He had heard Juror No. 12 state twice that morning that he "was not going to hang this guy" and felt this amounted to misconduct. He

had also heard Juror No. 12 state "because of his religious beliefs he could not judge or he could not put a man in prison, or something to that effect." The death penalty had been discussed in the jury room that morning, but it was not Juror No. 12 that initiated the discussion and Juror No. 12 might not even have made any comments on that subject. However, Juror No. 12 made continuous references to matters or scenarios he had seen on television shows and would try to connect those scenarios to the case on trial. He had concluded Juror No. 12 was incapable of making a simple decision. In Juror No. 10's opinion, Juror No. 12 could not understand the instructions.

*Juror No. 11*: He felt the lynch mob comment was misconduct. Juror No. 12 was also making comments that he was trying to do everything he could to prove the innocence of the defendant and perhaps the other jurors were not. The only references by Juror No. 12 to his religion consisted of comments to the effect that as long as the case did not involve the death penalty he could judge impartially. Juror No. 12 had also stated "I base most of my reality on movies I have seen." In Juror No. 11's opinion, Juror No. 12 was not making a good faith effort to deliberate.

*Juror No. 12*: He admitted making reference to television, but he stated it was mostly news programs and occasionally movies. He did not claim to be a street person and this fact made him seem naive to some of the jurors. Because he was a home person and did not go out in the streets and drink, he did not see those things the other jurors called covert and overt threats. When asked about any religious comments, Juror No. 12 stated he had told the other jurors he was a religious person but had never told them what his religion was. Although he was initially worried the case might be a death penalty case, once he found out it was not, he had no problems sitting as a juror. Regarding his religion, Juror No. 12 stated what he did was filtered by his religious beliefs, but he had not told the other jurors that he had problems judging other people. He also knew he could not go to the law library or any other library to look up matters. He might have told the other jurors he wanted to start at page one of the jury instructions and go forward, but that was at the very beginning of deliberations.

What he was really concerned about was what had happened within the jury room over the last two hours. Further questioning revealed that the jury had arrived at a verdict, but that verdict depended upon whether shooting a gun in the air within the city limits was a crime. The other jurors, in their haste to complete the trial, and because of their belief the court was going to rule a certain way in response to the question, had gone ahead and reached a unanimous verdict on second degree murder. Once Juror No. 12 heard the court's interpretation, he felt he had to change his vote to "not guilty."

Shortly after he changed his vote, the other jurors got together, he heard something like "jury misconduct, jury misconduct." He got the general impression "like [he] was being written up for something."

Juror No. 12 further indicated the big problem was in defining and determining the "provocative act" that was required for second degree murder. When asked, the other jurors refused to discuss what they believed was appellant's provocative act. He felt some of the jurors were trying to push things along because of their individual time constraints. For example, the jury foreperson stated she was due to go on vacation and she was "going to make it."

II.  *The Removal of Juror No. 12.*

Following the hearing, the court excused Juror No. 12 and gave as its reasons: (1) Juror No. 12 had transformed the deliberations into an exercise in futility; (2) Juror No. 12 was incapable of making a decision due to his religious beliefs; (3) Juror No. 12 was incapable of understanding the instructions; (4) the comments regarding the shooting a gun into the air with or without a license had no relevance to the case[2]; and (5) Juror No. 12's comments to the other jurors regarding being lynch jurors indicated Juror No. 12 could not deliberate with the other jurors. Based upon the above stated facts, the court found Juror No. 12 could not fulfill his obligations as a juror.

Defense counsel's motion for a mistrial was denied. Juror No. 12 was excused, and, after holding a hearing about possible juror misconduct among other jurors and the alternate jurors, an alternate juror was substituted for Juror No. 12. After instructing the jurors to begin their deliberations anew, trial was adjourned for the weekend.

The following Monday, after deliberating about three to four hours, the jury returned a verdict finding appellant guilty of two counts of second degree murder (Pen. Code, § 189) while personally using a firearm. (Pen. Code, § 12022.5.) Appellant was found not guilty of a conspiracy to commit murder.

III.  *The Trial Court Erred in Discharging Juror No. 12.*

A.  *The Standard for Discharging Jurors*

Penal Code section 1089 permits the trial court to excuse a juror if the juror is unable to perform his or her duty.      In reviewing the court's

---

[2]In light of the court's instructions, *post,* the question had relevance to the case.

decision to replace a juror with an alternate, we evaluate whether there has been an abuse of discretion. However, the juror's inability to perform as a juror "must ' "appear in the record as a demonstrable reality.' " [Citation.]" (*People v. Marshall* (1996) 13 Cal.4th 799, 843 [55 Cal.Rptr.2d 347, 919 P.2d 1280].); see also *People v. Williams* (2001) 25 Cal.4th 441, 461 [106 Cal.Rptr.2d 295, 21 P.3d 1209] [the court is justified in removing a juror once the required showing has been made as a demonstrable reality].)

■ A refusal to deliberate is a manifestation of an inability to perform his or her duty as required by Penal Code section 1089. (See *People v. Cleveland, supra,* 25 Cal.4th 466, 474-475 and cases cited therein.)

As pointed out by *Cleveland,* to protect the sanctity and secrecy of jury deliberations, caution should be used in making inquiries as to whether a juror is refusing to deliberate. (*People v. Cleveland, supra,* 25 Cal.4th at p. 480.) However, once the court has been placed on notice as to possible juror misconduct, the court must investigate whether there are grounds for replacing the juror. (*Id.* at p. 477.) In determining whether to discharge a juror because of a failure to deliberate, *Cleveland* teaches us, "A refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury. The circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge. Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge. A juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussion will not alter his or her views. (See *People v. Castorena* (1996) 47 Cal.App.4th 1051, 1066-1067 [55 Cal.Rptr.2d 151].)" (*People v. Cleveland, supra,* 25 Cal.4th at p. 485.)

### B. *The Erroneous Instructions on the Provocative Act Doctrine*

■ At trial it was the prosecution's theory that appellant, being responsible for the gun battle in which two people died, was guilty of both murders under the provocative act theory of *People v. Washington* (1965) 62 Cal.2d 777 [44 Cal.Rptr. 442, 402 P.2d 130], the same as if he had fired the fatal

shots. Accordingly, the prosecutor argued the evidence disclosed that appellant, or Hovik (appellant's associate), had initiated a gun battle and, in response to this provocation, Armen Gekchyan had accidentally shot and killed his own brother Vahan Gekchyan. In the ensuing gun battle someone else had shot Sarkis Kakachayan in the back, killing him.

The trial court was apparently unaware of *In re Aurelio R.* (1985) 167 Cal.App.3d 52, 60 [212 Cal.Rptr. 868] and *People v. Gallegos* (1997) 54 Cal.App.4th 453 [63 Cal.Rptr.2d 382], which hold that where the defendant attempts to kill or assault someone with a firearm, there is no need for a separate provocative act to be committed; the act of attempting to kill is by itself a provocative act that is likely to draw a deadly response. Here, however, the jury was instructed that, for the doctrine to apply the People had to prove: "(1) The defendant personally committed the crime of attempted murder or the crime of assault with a firearm, as defined elsewhere in these instructions; (2) During the defendant's commission of the crime of attempted murder or assault with a firearm, the defendant *also* committed an intentional provocative act; (3) Another person, in response to the provocative act by the defendant, killed Vahan Gekchyan and/or Sarkis Kakachayan; and (4) The defendant's commission of the intentional provocative act was a cause of the death of Vahan Gekchyan and/or Sarkis Kakachayan." (Italics added.) Elsewhere in the instructions the court defined an intentional provocative act as being an intentional act, the natural consequences of which were dangerous to human life and the act was performed with knowledge of the danger to, and with conscious disregard for human life.

The problem with the court's instruction was that it required the prosecution to prove too much. ▆ A defendant's attempts to kill or assault someone with a firearm are by themselves provocative acts likely to draw a deadly response. Thus, there is no need for a separate provocative act to be committed. (*In re Aurelio R., supra,* 167 Cal.App.3d 52, 60; *People v. Gallegos, supra,* 54 Cal.App.4th 453.)

▆ The prosecution recognized this fact when it argued appellant had "capped" off the first round by shooting at Armen Gekchyan, thus initiating the deadly responses that ended up with two people fatally wounded. The prosecutor also argued the intentional provocative act was the shooting by appellant, "whether it be in the air or at somebody." The defense contested appellant's initiation of the events, but concurred with the prosecutor's conclusion that Vahan Gekchyan had been accidentally killed by his brother. In rebuttal, the prosecutor argued merely pulling and pointing the guns, even in the air, would qualify as a provocative act even if appellant did not fire first.

It was with this background that the jury, including Juror No. 12, had initially voted to convict appellant. However, before Juror No. 12 would agree totally he wanted to know, "if shooting a gun in the air within city limits is a crime." As he told the court, he was having problems determining what appellant's *additional* provocative act was. The other jurors, although they all believed there had been a separate provocative act, refused to discuss with Juror No. 12 what they believed was the additional provocative act.

Thus, the jury was deadlocked on what should have been a non-issue in the case: the existence or nonexistence of a separate provocative act. (See *In re Aurelio R., supra*, 167 Cal.App.3d 52, 60; *People v. Gallegos, supra,* 54 Cal.App.4th 453.) Had the jury been correctly instructed, even Juror No. 12 was of the opinion appellant was guilty of murder in the second degree. Thus, with proper instructions, appellant probably would have been convicted and a verdict returned before the question on shooting a gun in the city limits was asked of the court. However, rather than correct the error in the instructions, the court chose to excuse Juror No. 12 because he was following the court's instructions.

### C. *Juror No. 12 Was Improperly Excused*

The Attorney General attempts to justify the dismissal of Juror No. 12 on four separate grounds. The record does not support the assertions. The first ground, that Juror No 12's religious beliefs prevented him from making a decision, misstates the evidence. What other jurors stated was that Juror No. 12 had said he was glad that this was not a death penalty case because, had there been the possibility of death, he could not have participated in the trial.

The next ground asserted, that Juror No. 12 was concerned with penalty, also does not withstand scrutiny. What Juror No. 12 stated was that once he was assured this was not a death penalty case he felt very comfortable sitting as a juror.

The assertion that Juror No. 12 refused to follow the instructions of the court is also without support in the record. What occurred is that during the deliberations, Juror No. 12 made a statement that he did not want to be a part of any "lynch mob." Juror No. 12 also stated he wanted to go to the library or consult a dictionary for assistance. However, there was no evidence that he did so. Merely wanting assistance is not and cannot be misconduct. As far as making incendiary comments after being admonished by the court not to do so, there is nothing in the record to indicate Juror No. 12 made any comments other than what one would expect of a freewheeling discussion of

the issue in the jury room. There is nothing in the law that requires jurors to adhere to Chesterfieldian manners in the jury room.[3]

The real problem, which should have been apparent to everyone in the courtroom, was that, after more than five days of deliberation, the jury was deadlocked at 11 to one for guilt of second degree murder. After the court answered the question about firing a gun in the air, Juror No. 12 indicated he was not going to vote for a conviction. It was at that point that the other jurors and the court decided Juror No. 12 was refusing to deliberate. However, as pointed out by *Cleveland*, "A juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussion will not alter his or her views." *(People v. Cleveland, supra*, 25 Cal.4th at p. 485.)

That is exactly what occurred here: Juror No. 12 had been deliberating fully and completely for more than five days. It was only when he indicated that he was not going to change his view and was going to vote not guilty that the other jurors asked the court to intervene because of juror misconduct.[4] By removing Juror No. 12 at this point in the proceedings, the court committed reversible error. (See *People v. Cleveland, supra*, 25 Cal.4th at p. 485; *People v. Valot* (2002) 103 Cal.App.4th 1247 [127 Cal.Rptr.2d 423], review granted Feb. 25, 2003, S112450.)

The dissent, although conceding the removal of Juror No. 12 was error, nonetheless concludes the error was nonprejudicial, because Juror No. 12 had indicated to the court that he was ready to vote for guilt absent the error in the instructions. ■ However, "Every criminal defendant is entitled to a unanimous verdict. (Cal. Const., art. I, § 16; *People v. Wheeler* (1978) 22 Cal.3d 258, 265 [148 Cal.Rptr. 890, 583 P.2d 748].) And to be valid a

---

[3]See *People v. Johnson* (1992) 3 Cal.4th 1183, 1253-1255 [14 Cal.Rptr.2d 702, 842 P.2d 1], and in particular, see *People v. Keenan* (1989) 46 Cal.3d 478 [250 Cal.Rptr. 550, 758 P.2d 1081] (juror's threat in jury room to kill another juror if deliberations went for nought was not prejudicial misconduct).

[4]The jury had been instructed pursuant to CALJIC No. 17.41.1, which encouraged such communications with the court. (See *People v. Engelman* (2002) 28 Cal.4th 436, 440 [121 Cal.Rptr.2d 862, 49 P.3d 209] ["Directing the jury immediately before deliberations begin that jurors are expected to police the reasoning and arguments of their fellow jurors during deliberations, and immediately advise the court if it appears that a fellow juror is deciding the case upon an 'improper basis,' may curtail or distort deliberations. Any juror is free, of course, to bring to the court's attention any perceived misconduct that occurs in the course of jury deliberations. In our view, however, it is not conducive to the proper functioning of the deliberative process for the trial court to declare—before deliberations begin and before any problem develops—that jurors should oversee the reasoning and decisionmaking process of their fellow jurors and report perceived improprieties in that process to the court."].)

criminal verdict must express the independent judgment of each juror. (See *People* v. *Gainer* (1977) 19 Cal.3d 835, 848-849 [139 Cal.Rptr. 861, 566 P.2d 997, 97 A.L.R.3d 73].) To protect that constitutional right it is provided by statute that on the polling of a jury 'if anyone answer in the negative, the jury must be sent out for further deliberation.' (Pen. Code, § 1163.) Only if no disagreement is expressed on polling is the verdict complete. (Pen. Code, § 1164.) Thus, any juror is empowered to declare, up to the last moment, that he dissents from the verdict. (See *Fitzpatrick* v. *Himmelmann* (1874) 48 Cal. 588, 590.)" (*Chipman* v. *Superior Court* (1982) 131 Cal.App.3d 263, 266 [182 Cal.Rptr. 123].) Here, the jurors with Juror No. 12 being on the panel, were never polled and never required to state in open court, in a formal setting, with the defendant present (Pen. Code, § 1148), that the defendant was guilty. As pointed out by Justice Werdegar in her concurring opinion in *People v. Cleveland, supra*, 25 Cal.4th at page 487, the removal of a juror after deliberations have commenced may impinge upon a defendant's constitutional right to a jury trial. The concerns are such that we cannot state the erroneous removal of Juror No. 12 is nonprejudicial.

## DISPOSITION

The judgment is reversed.

Johnson, Acting P. J., concurred.

**WOODS, J.,** Concurring and Dissenting.—I concur in the majority opinion the trial court erred in excusing Juror No. 12, but dissent in the holding that the error was reversible. In that regard, I interpret the record differently and vote to affirm the judgment.

At trial, the jury was instructed on murder and manslaughter in addition to conspiracy to commit murder. Additionally, if the jury found appellant had personally committed a first degree murder and was also guilty of another murder, the jury was instructed they could find the special circumstance of multiple murders to be true. (Pen. Code, § 190.2.)

It was the prosecution's theory that appellant or Hovik (appellant's associate) had initiated the gun battle and, in response to this provocation, Armen Gekchyan had accidentally shot and killed his brother Vahan Gekchyan. Under the provocative act doctrine of *People v. Washington* (1965) 62 Cal.2d 777 [44 Cal.Rptr. 442, 402 P.2d 130], this would make appellant guilty of murder the same as if he had fired the fatal shot.

As the majority correctly points out, the trial court drafted its own instruction on the provocative act doctrine and was apparently not aware of

*In re Aurelio R.* (1985) 167 Cal.App.3d 52, 60 [212 Cal.Rptr. 868], and *People v. Gallegos* (1997) 54 Cal.App.4th 453 [63 Cal.Rptr.2d 382], which hold that where the defendant attempts to kill or assault someone with a firearm, there is no need for a separate provocative act to be committed: the act of attempting to kill is by itself a provocative act that is likely to draw a deadly response. In this case, as the majority again points out, the jury was instructed that for the doctrine to apply the People had to prove: "(1) The defendant personally committed the crime of attempted murder or the crime of assault with a firearm, as defined elsewhere in these instructions; (2) During the defendant's commission of the crime of attempted murder or assault with a firearm, the defendant *also* committed an intentional provocative act; (3) Another person, in response to the provocative act by the defendant, killed Vahan Gekchyan and/or Sarkis Kakachayan; and (4) The defendant's commission of the intentional provocative act was a cause of the death of Vahan Gekchyan and/or Sarkis Kakachayan." (Italics added.) The court defined an intentional provocative act in other instructions as being an intentional act, the natural consequences of which were dangerous to human life and the act was performed with knowledge of the danger to, and with conscious disregard for human life.

The court's instruction was too burdensome in that it required the prosecution to prove too much. Attempts to kill or assault someone with a firearm are by themselves provocative acts likely to draw a deadly response. A separate provocative act is not required. (*In re Aurelio R., supra,* 167 Cal.App.3d 52, 60; *People v. Gallegos, supra,* 54 Cal.App.4th 453.)

In its argument the prosecution urged that appellant had "capped" off the first round by shooting at Armen Gekchyan thus initiating the deadly responses that ended up with two people fatally wounded. The prosecution further argued the intentional provocative act was the shooting by appellant, "whether it be in the air or at somebody." The defense concurred with the prosecutor's conclusion that Vahan Gekchyan had been accidentally killed by his brother, while contending that appellant had not initiated the events. In rebuttal, as the majority points out, the prosecutor argued merely pulling and pointing the guns, even in the air, would qualify as a provocative act even if appellant did not fire first.

The jury, including Juror No. 12, had initially voted to convict appellant with this background before it. Juror No. 12, being apparently cautious, would not totally commit until he found out, "if shooting a gun in the air within city limits is a crime." Juror No. 12 informed the court he was having problems determining what "additional" provocative act appellant committed. The other jurors were persuaded there had been a separate provocative

act, but refused to discuss with Juror No. 12 what they believed was the additional provocative act.

The jury turned out to be deadlocked on a nonissue in the case, namely the existence or nonexistence of a separate provocative act. (See *In re Aurelio R., supra,* 167 Cal.App.3d at p. 60; *People v. Gallegos, supra,* 54 Cal.App.4th 453.) Under proper instructions, even Juror No. 12 was of the opinion appellant was guilty of murder in the second degree. Thus, appellant would have been convicted and a verdict returned, under proper instruction, before the question on whether shooting a gun in the city limits was asked of the court.

I find no prejudice to appellant by the replacing of Juror No. 12 under these circumstances. (*People v. Watson* (1956) 46 Cal.2d 818, 835-836 [299 P.2d 243].) The error in this case did not amount to structural error requiring automatic reversal within the meaning of the United States Supreme Court cases. (See *People v. Flood* (1998) 18 Cal.4th 470, 502-503 [76 Cal.Rptr.2d 180, 957 P.2d 869].) Even using the standard of *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065], the error was harmless beyond a reasonable doubt. It is true that up until the very moment of polling the jury, Juror No. 12 could change his mind and vote for acquittal, but under the facts presented I find that a reasonable and probable inference is to be drawn which established beyond a reasonable doubt that no such change of mind would have occurred. I would affirm the judgment.