Filed 5/13/14  P. v. Nicolas CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RICHARD SAN NICOLAS,<br><br>    Defendant and Appellant. | G049211<br><br>(Super. Ct. Nos. RIF1104759, RIF1100937 & RIF1102707)<br><br>O P I N I O N |

        Appeal from judgments of the Superior Court of Riverside County, Bernard Schwartz, Judge.  Affirmed.

        Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Warren Williams, Deputy Attorneys General, for Plaintiff and Respondent.

This is an appeal from judgments rendered against Richard San Nicolas in three criminal cases. San Nicolas contends the trial court improperly removed a juror in one of the cases and erroneously excluded his proffered evidence in another. He also contends the court unlawfully fined him in all three cases. Finding these contentions unmeritorious, we affirm the judgment.

FACTUAL & PROCEDURAL OVERVIEW

In Case No. RIF1102707, San Nicolas surreptitiously dropped a bindle of methamphetamine while being booked into the Riverside County jail. He was convicted of unlawfully possessing a controlled substance and found to have committed that offense while released from custody on another case.

In Case No. RIF1100937, San Nicolas stole some ink cartridges and a bottle of whisky during two separate shoplifting incidents. He was convicted of commercial burglary, two counts of petty theft with a prior and found to have committed one of the thefts while released from custody on another case.

In Case No. RIF1104759, San Nicolas was convicted of failing to register as a sex offender. As in his other two cases, he was also found to have suffered multiple prior strike convictions and served multiple prior prison terms. Due to the priors, he was sentenced to a cumulative term of 111-years-to-life in prison. The trial court also ordered him to pay a $240 restitution fine for each of his crimes.

I

The main issue on appeal concerns the jury deliberations in the shoplifting case. San Nicolas contends the trial court violated his right to a unanimous and impartial jury by removing a juror for failing to deliberate, but we do not believe the court abused its discretion in removing the subject juror.

The jury in Case No. RIF1100937 was sworn in on March 13, 2012. Testimony began that day and wrapped up the following morning. Two hours later, at 11:53 a.m., the jury commenced its deliberations. Following a break for lunch from

2

12:05 p.m. to 1:30 p.m., it deliberated until 4:00 before recessing for the evening. The next day, March 15, deliberations resumed at 10:30 a.m. At 10:58 a.m., the court announced it had received two notes from the jury.

The first note was a request to review the testimony of security guard Robert Estrella, who witnessed appellant's alleged theft of the whiskey. The second note read: "We are requesting further instructions regarding [the] deliberation process. [¶] A certain juror is refusing to deliberate any further and has claimed to base his/her decision on 'feelings.'"

Upon receiving the notes, the judge summoned counsel and it was agreed they would call the jury foreman, Juror No. 4, into the courtroom for questioning about the deliberations process. The foreman identified Juror No. 1 as the problem juror. He said she had basically told the rest of the jurors "this is my opinion, and I'm not talking with you anymore." He also reported Juror No. 1 had been playing tic-tac-toe while the others were discussing the case, and when he told her to stop, she said it was her right to do so. Asked if Juror No. 1 had ever explained the basis for her opinion, the foreman initially said her "rationale is based on feelings and not evidence." Then he said she had never really articulated any basis for her opinion. He said that, rather than discussing the merits of the case, Juror No. 1 had insisted she had a right to her own opinion, and she didn't have to explain it to anyone else. Asked if he thought it would be helpful if the judge instructed Juror No. 1 to deliberate with the others, the foreman said, "I believe it could be beneficial."

After questioning the foreman, the judge sought input from counsel about how to proceed. It was ultimately decided that they would talk to Juror No. 1 about the situation before deciding whether to question the rest of the jurors.

In response to the court's question about whether she was deliberating with other jurors, Juror No. 1 replied, "Yes, I am. But their problem is, they can't convince me to vote their way, so they are upset. . . . [T]hey want to sit there and argue, and I

3

don't want to sit there and argue." Asked if she was open to talking about the case with the other jurors, Juror No. 1 responded, "I have an open mind of talking with them with the case, but the way I feel is the way I feel." She said she had already heard them out and discussed her point of view with them. Indeed, she felt she had explained why she believed the facts and law support her position, but "they [didn't] want to hear it." Therefore, she was standing firm on her opinion and didn't want to discuss the case any further with them.

Given the difference in opinion between the foreman and Juror No. 1 about Juror No. 1's willingness to deliberate, the judge decided to question the rest of the jurors to find out if Juror No. 1 had "engaged in her position" or was "just stonewalling and refusing to deliberate." Although the judge told the jurors he didn't want to know what the vote count was, it quickly became apparent the jury was divided 11 to 1, with Juror No. 1 being the lone vote for not guilty. Both the court and counsel asked questions of the respective jurors.

Juror No. 2 reported Juror No. 1 was very adamant about her decision, but she "doesn't want to give a reason" for her opinion and she "doesn't want to deliberate." Juror No. 2 said that became apparent "[y]esterday when we started" and "[t]oday . . . [s]he has just been sitting" there, "very quiet." She said when Juror No. 1 was pressed by other jurors to explain her opinion, there was no dialogue. Instead, she had basically said "this is the way it is, it's black and white, and I'm not talking about it anymore."

Juror No. 3 reported Juror No. 1 had participated in the various votes taken by the jury during its deliberations. However, beyond simply stating her vote, she had not explained the basis for her opinion. Juror No. 3 said the impasse arose on the first day of deliberations, and since then, Juror No. 1 had not been willing to discuss the case with the rest of the jurors.

Juror No. 5 told the court Juror No. 1 "is not discussing the trial openly with us." He said that beyond expressing her vote, Juror No. 1 had not really explained

4

the basis for her opinion. Rather, "she just said she had the right to feel the way she feels." Asked when that first became apparent, Juror No. 5 said "yesterday," and things hadn't improved much since then. Juror No. 5 indicated the rest of the jurors were frustrated and having trouble getting through to Juror No. 1. However, when he used a "soft tone" with her, she gave him "some leverage" in return. He felt that if his fellow jurors took a similar approach and were more patient with Juror No. 1, it would probably yield more discussion.

Juror No. 6 reported Juror No. 1 "doesn't want to deliberate. She said she has a right not to deliberate. She plays tic-tac-toe . . . and doesn't answer questions." This became apparent "immediately" after deliberations began, and when the other jurors tried to engage her, "she gets kind of belligerent and raises her voice." Juror No. 6 said Juror No. 1 was "really big on 'feelings,'" and when pressed to explain herself, she said she has the right to feel the way she does, and it's not the other jurors' job to try to change her mind. According to Juror No. 6, it's even difficult to get Juror No. 1 to participate in the voting process. She felt Juror No. 1 was being "very childish" and described the atmosphere in the jury room as "very overwhelming."

However, Juror No. 6 did not pin all the blame on Juror No. 1. While describing Juror No. 1 as being "pretty hard-headed," Juror No. 6 felt her stubbornness was probably just a defense mechanism to help her deal with the situation. Asked if Juror No. 1 would have been more amenable to "a different communication method," Juror No. 6 surmised, "It might have helped." She said, "We could have all done things a little different," and if she were the foreperson, she would have tried to create a more respectful atmosphere. But as it turned out, things started to sour about 10 minutes into deliberations, and after that, "it never switched."

Juror No. 7 reported the jury was "at a standstill at the moment" because Juror No. 1 did not want to deliberate. She said, "We're willing to carry a conversation and to deliberate," but "as of yesterday," "the conversation [has] not [been] going

5

anywhere," due to Juror No. 1's recalcitrance. Asked if she thought things might eventually turn around, Juror No. 7 responded, "I am hopeful that it does go into a conversation. It was yesterday, and now it's – their minds are made up, and nobody . . . [wants to] change their mind . . . ." However, Juror No. 7 felt if they received witness Estrella's testimony, "that might be helpful" because Juror No. 1 seemed like she was "still open to considering evidence."

Juror No. 8 was asked if Juror No. 1 was openly discussing the facts and the law or just stating her opinion without discussing it any further. He said, "It goes back and forth." "We've been successful with getting [Juror No. 1] to open up, but it only lasts for a small period of time," like "three to five minutes." And although there had been some cordial discussions, Juror No. 1 had "made up her mind" about the case and was "not open to even looking at it from any other perspective." Juror No. 8 said that became apparent about 20 minutes into deliberations. Asked whether he thought Juror No. 1 had considered the evidence and applied the law in forming her decision, Juror No. 8 answered, "I would not say . . . she's applying the law. I will say . . . she's made a decision, and . . . her decision is her decision, and she's not [been] presented [with] any kind of evidence that would allow her to change that decision at all."

Juror No. 9 estimated deliberations broke down within the first hour. He described the problem as Juror No. 1's "unwilling[ness] to deliberate, or at least discuss some of the materials that were brought in." Juror No. 9 was hoping things would improve following the evening break, but when deliberations resumed the next day, there was no progress. Although Juror No. 1 has been willing to state what her opinion is, she is "pretty vague" when it comes to explaining her position. Juror No. 9 did not think having the transcripts of certain testimony or reviewing the evidence further would cause Juror No. 1 to change her mind.

Juror No. 10 told the court, "We're all trying to talk it through, trying to work as a group and be fair," but Juror No. 1 "doesn't want to hear anything, just doesn't

6

want to talk it through." Asked if Juror No. 1 ever participated in deliberations as far as "providing [her] point of view [as to] how [she] see[s] the facts, how [she] see[s] the law," Juror No. 10 said, "At one time, yes." However, that was early on during deliberations, and since then, Juror No. 1 had made it clear that her mind was made up and that she didn't want to discuss the case anymore.

Juror No. 11 reported that while deliberations were currently at a standstill, all 12 jurors started off deliberating in good faith. Particularly, she and Juror No. 1 were "getting along and having a good discussion." But then the other jurors chimed in and started telling Juror No. 1 she was "wrong." In Juror No. 11's mind, it seemed like they were "egging" on Juror No. 1 and "almost trying to get her mad for some reason." Juror No. 11 described the jury room as "catty" and "rather unfriendly" and construed Juror No. 1's refusal to engage as a defense mechanism for "being attacked." She also indicated there were at least two jurors who were responsible for the current standoff. However, when asked if "the problem is more of a problem associated with one particular juror, or maybe an overall problem . . . about playing nice together in the sandbox," Juror No. 11 put the blame squarely on Juror No. 1. She did not think there was anything that could be done at this point to engage Juror No. 1 in deliberations.

Juror No. 12 reported the jury got bogged down "almost immediately" after they were sent out. That was because Juror No. 1 made her opinion known and indicated she wasn't going to change her mind. There was some progress on the second day of deliberations, in that Juror No. 1 was willing talk about the case and answer some of the other juror's questions, but she still wouldn't "open [her] mind." Describing the deliberations as "slow," Juror No. 12 reported Juror No. 1 was willing to state her opinion, but she doesn't link it to any particular evidence. Instead, she simply says "this is my vote because this is how I feel about it."

Based on this record, defense counsel did not believe there was good cause to discharge Juror No. 1 for refusing to deliberate. He argued, "I think all the evidence is

7

the deliberation is difficult, it's troublesome, but I think it is progressing. I don't think we've risen to the level where we need to consider replacing a juror, and I don't think we've risen to the level where we . . . have a nondeliberating [juror]." The prosecutor disagreed. He felt Juror No. 1 she should be replaced because she was not engaging, "or even showing a willingness to engage," in discussions with her fellow jurors.

Assessing the situation, the trial judge said, "I would be the first to agree that it's not unanimous as to what's going on. I'm a little troubled by the fact that a juror, or two jurors, are saying that they [took] a different approach [with Juror No. 1] and were able to get certain information [from her], when other jurors didn't see or hear that."

However, the overriding concern of the court was that Juror No. 1 may have made up her mind about the case without sufficiently engaging in the deliberative process. While recognizing jurors often form their opinions about the case early on during deliberations, the court said they nevertheless "have to discuss openly what the facts are in the case and what leads them to believe that. Ultimately, they can still have the same position that they have when they walk in the room as when they walk out, whether it's consistent with the other 11 jurors [or] not, and I respect that. But my concern is that it appears as though Juror [No.] 1 had a position, made a decision right at the beginning, before really there was . . . an opportunity to discuss the facts and circumstances of the case. And while there may be glimmers of time where she opens up and says something, for the most part, it appears as though she's been stonewalling, refusing to deliberate, refusing to discuss the facts of the case."

Continuing, the judge stated, "There are other issues obviously. A decision can't be made based on feelings; it needs to be based on evidence and facts that are found. And I heard the word 'feelings' talked about a lot."

At that point, defense counsel reminded the judge that, when questioned, Juror No. 1 claimed that she had been deliberating with the others jurors. While recognizing that is what Juror No. 1 said, the judge found that flew "in the face of the

8

majority of the jurors, maybe all but two, who said that she was[n't deliberating]. And so it is certainly not an opinion held by the rest of the group." " I think [Juror No. 1] is not deliberating in good faith, despite her own comments. I think it's clear to the court that there is an overwhelming consensus of the jury that there is a problem. That problem is Juror No. 1. And it's not just because she's voting differently than they are. It's because she's refusing to participate in open discussion, give reasons behind her decisions. They are frustrated. And I think that is very apparent to the court. And the fact that she's ignoring [them] while they are discussing the case, apparently engaged in some other mind game, or tic-tac-toe, whatever it is, is further concerning."

In the end, the judge simply did not believe there was any way deliberations could go forward with Juror No. 1 on the jury. Therefore, he removed her from the jury, replaced her with a substitute and ordered the jury to begin its deliberations anew. That afternoon, the jury deliberated for about 15 minutes. Deliberations resumed the following morning, and at 11:49 a.m., the jury announced it had reached a unanimous verdict. It found appellant guilty of commercial burglary and two counts of petty theft with a prior, and it found him not guilty on a second charge of commercial burglary.

The law is clear. "'Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty "to make whatever inquiry is reasonably necessary" to determine whether the juror should be discharged.' [Citation.] 'We review a trial court's decision to discharge a juror under an abuse of discretion standard, and will uphold such decision if the record supports the juror's disqualification as a demonstrable reality. [Citations.] The demonstrable reality test "requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that [cause for removal] was established." [Citation.] To determine whether the trial court's conclusion is "manifestly supported by evidence on which the court actually relied," we consider not just the evidence itself, but also the record of reasons the court provided. [Citation.]" (*People v. Williams* (2013) 58 Cal.4th 197, 292.)

9

While a juror may not be discharged for "harbor[ing] doubts about the sufficiency of the prosecution's evidence" (*People v. Cleveland* (2001) 25 Cal.4th 466, 483 (*Cleveland*)), the refusal to deliberate is grounds for removal (*People v. Engelman* (2002) 28 Cal.4th 436, 443 (*Engelman*)). "A refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury. The circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge. Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge. A juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussion will not alter his or her views. [Citation.]" (*Cleveland, supra,* 25 Cal.4th at p. 485.)

San Nicolas argues the record shows Juror No. 1 sufficiently deliberated, and the only reason she was removed is because she viewed the evidence differently than her fellow jurors, which is not a proper basis for removal. The Attorney General, on the other hand, argues Juror No. 1 was justifiably removed because after expressing her opinion at the outset of deliberations, she refused to consider other points of view or otherwise engage in the deliberative process. We think the Attorney General has the better argument.

In approaching this issue, we are mindful not only of the legal standard applicable to San Nicolas' claim, i.e., the demonstrable reality test discussed above, but

10

the standard of review applicable to the factual findings underlying the trial court's decision. As our Supreme Court has recognized, "The evidence bearing on the question whether a juror has exhibited [cause for removal] during deliberations may be in conflict. Often, the identified juror will deny it and other jurors will testify to examples of how he or she has revealed it. [Citation.] In such a case the trial court must weigh the credibility of those whose testimony it receives, taking into account the nuances attendant upon live testimony. The trial court may also draw upon the observations it has made of the jurors during voir dire and the trial itself. Naturally, in such circumstances, we afford deference to the trial court's factual determinations, based, as they are, on firsthand observations unavailable to us on appeal." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1053; accord, *People v. Lomax* (2010) 49 Cal.4th 530, 590 [where there is conflicting evidence about whether a juror should be removed, it is for the trial court to "weigh the credibility of those testifying," and the reviewing court must "defer to factual determinations based on these assessments"].) In other words, we do not reweigh the evidence but simply assess whether "the trial court's conclusion is manifestly supported by evidence on which the court actually relied." (*People v. Barnwell, supra,* 41 Cal.4th at p. 1053; accord, *People v. Duff* (2014) 58 Cal.4th 527, 560.)

In this case, it is. As the trial court recognized, there was conflicting evidence regarding the extent of Juror No. 1's participation in deliberations. Some of the jurors reported Juror No. 1 had engaged in deliberations, but even those jurors said the degree of her participation was limited and fleeting. And although Juror No. 1 claimed she had explained the basis of her opinion to her fellow jurors, the other jurors did not share this view for the most part. To the contrary, they generally reported Juror No. 1 had either failed to explain her position at all, or that she did so in cursory fashion by simply saying, "This is the way I feel." Juror No. 1 was certainly entitled to her own opinion about the case, but "jurors entering into deliberations should be tolerant of and patient with differences of opinion that may arise, and should remain open to

11

persuasion." (*Engelman, supra*, 28 Cal.4th at p. 447; see also CALCRIM No. 3550, which, as given in this case, informed the jurors to "keep an open mind and openly exchange your thoughts and ideas" during deliberations.)  Given the jurors' responses, the trial judge was rightfully concerned that Juror No. 1 had failed to fulfill her duty in this regard.  The fear was, as reflected in responses that were deemed credible by the judge, that Juror No. 1 had made a decision at the beginning of deliberations before there was sufficient time to discuss the case and then subsequently refused to consider other points of view or even explain her own.

Some of the jurors defended Juror No. 1's guarded behavior on the basis she was outnumbered and treated disrespectfully in the jury room.  However, those same jurors also recognized that Juror No.1 was at least partly to blame for the dynamic of the deliberations.  In fact, it is clear from the bulk of the jurors' statements that much of the frustration vented on Juror No. 1 was brought about by her own failure to engage in the deliberative process or offer any sort of substantive explanation for her point of view.  That is the key distinction between this case and *Cleveland*, upon which San Nicolas heavily relies.

In *Cleveland*, the California Supreme Court ruled that a juror was improperly dismissed because "it became apparent under questioning that the juror simply viewed the evidence differently from the way the rest of the jury viewed it." (*Cleveland, supra*, 25 Cal.4th at p. 486.)  While the juror may have "employed faulty logic and reached an 'incorrect' result," his dismissal was deemed an abuse of discretion because the record showed he had "engaged in the deliberative process" by listening to, and trying to get his own point of view across to, the other jurors.  (*Ibid*.)

In contrast, Juror No. 1 did virtually nothing in terms of engaging in this sort of interactive behavior.  To the extent she did try to get her view across to the other jurors, she did so only briefly and without providing the sort of supporting rationale that would enable meaningful discussion.  By simply telling the other jurors, "This is the way

12

I feel," when asked to explain her position, and by playing tic-tac-toe during deliberations, Juror No. 1 not only signaled she wasn't willing to discuss her position, she also gave the impression she wasn't interested in hearing other points of view. And that is probably why nearly all of the jurors felt that deliberations were irretrievably impaired. While the foreman believed it might be helpful if the court instructed Juror No. 1 to deliberate, we cannot say the court abused its discretion by foregoing that option and removing Juror No. 1 from the jury instead. Rather, we are satisfied the court gave careful consideration to this issue and its decision to remove Juror No. 1 is manifestly supported by evidence on which it relied. Therefore, we are powerless to disturb it. We discern no violation of San Nicolas' right to a unanimous verdict by an impartial jury or to due process of law. (See *People v. Diaz* (2002) 95 Cal.App.4th 695, 702-703 [although juror had initially participated in deliberations, she was properly removed because she subsequently withdrew from the discussion and would only say, "This is how I feel" when asked to explain the basis of her opinion]; Compare *People v. Karapetyan* (2003) 106 Cal.App.4th 609, 621 [juror's removal for failing to deliberate unjustified where he "had been deliberating fully and completely for more than five days," and it "was only when he indicated that he was not going to change his view . . . that the other jurors asked the court to intervene"].)

## II

Turning to Case No. RIF 1104759, San Nicolas argues the trial court erred in excluding his proffered evidence that he had a "habit" of complying with the sex offender registration requirements. He contends that, beyond just constituting an abuse of discretion, the court's decision violated his right to a fair trial, to confront witnesses, and to present a defense. We disagree across the board.

At trial, the parties stipulated San Nicolas had previously been convicted of an offense that required him to register as a sex offender. The only disputed issue was whether he had been residing in Riverside County so as to require him to register there.

13

San Nicolas testified he lived solely in San Bernardino County, where he was in fact registered. However, the prosecution presented evidence that during the period in question San Nicolas signed a lease for an apartment in Riverside and spent a fair amount of time there. In finding San Nicolas guilty of failing to register, the jury determined he should have informed authorities he was residing at the Riverside apartment.

San Nicolas' prior compliance with the registration requirements was the subject of considerable discussion before trial. Defense counsel represented that not only was San Nicolas registered as a sex offender in San Bernardino at the time he was accused of failing to register in Riverside, he had previously registered in San Bernardino on a consistent basis, and he had registered as a transient in Riverside on one occasion, albeit before the present case arose. Defense counsel argued these past registration efforts were relevant to disprove the prosecution's theory that San Nicolas was residing in Riverside at the time in question. More precisely, defense counsel posited that because San Nicolas had a history of registering, the fact he was not registered in Riverside proved he wasn't living there at that time.

The trial court was not persuaded. It ruled the fact San Nicolas may have registered at times before this case arose only shows "that he [was] in compliance at a location where he purportedly lived at. It doesn't show that he [didn't] live at another location [at another time]. That's why there is no relevancy to the [prior] registration [evidence]." Viewing the evidence as improper character evidence, the court did not believe it had any bearing on the pivotal question of whether or not San Nicolas was residing in Riverside at the time in question.

San Nicolas argues the evidence was admissible under Evidence Code section 1105, which states, "Any otherwise admissible evidence of habit or custom is admissible to prove conduct on a specified occasion in conformity with the habit or

14

custom."[1]  However, San Nicolas did not intend to use the evidence he had registered as a sex offender in the past to prove he was registered in Riverside at the time in question. As a matter of fact, it was undisputed that he was *not* registered in Riverside at that time. Rather, he was trying to use the evidence to prove a different fact, namely that he was not living in Riverside during the alleged period of noncompliance.  As the trial court rightly observed, it does not logically follow that because San Nicolas had registered in San Bernardino in the past that he was not living in Riverside at the time in question. Therefore, the proffered evidence was not admissible as habit evidence.  (Compare *People v. Memro* (1985) 38 Cal.3d 658, 681, overruled on other grounds in *People v. Gaines* (2009) 46 Cal.4th 172, 181 [habit evidence deemed relevant where it was being offered to prove conformance *with that particular habit*].)

Rather than attempting to use the proffered evidence as habit evidence, it appears that, as the trial court recognized, San Nicolas was really trying to use it to show his general character for lawfulness.  In effect, he wanted to use the evidence of his prior compliance with the registration laws to convince the jury that he was not the type of person who would ever skirt his legal responsibility to register.  However, evidence that a person has a general tendency to act a certain way under certain circumstances is generally inadmissible under the rules of evidence.  (Evid. Code, § 1101; *People v. Shoemaker* (1982) 135 Cal.App.3d 442, 446-447, fn. 2.)

Because the proffered evidence constituted impermissible character evidence and was not admissible under the rules respecting habit evidence, the trial court did not abuse its discretion in excluding it.  Furthermore, because the evidence was properly excluded under the rules of evidence, we discern no violation of appellant's constitutional rights.  As in most situations, application of the ordinary rules of evidence

---

[1]  We reject the state's claim San Nicolas forfeited his right to raise this argument because, even though his trial attorney did not expressly mention Evidence Code section 1105 below, it is clear he was relying on that provision.  (See *People v. Partida* (2005) 37 Cal.4th 428, 434-435 [an objection will be deemed sufficient for purposes of appeal where it fairly appraises the court and opposing counsel of the basis on which it is grounded].)

15

did not result in the infringement of any constitutional guarantees in this case. (See *People v. Boyette* (2002) 29 Cal.4th 381, 414; *People v. Kraft* (2000) 23 Cal.4th 978, 1035.)

III

Lastly, San Nicolas contends that by fining him $240 for each of his offenses, the trial court imposed an unauthorized sentence and violated his ex post facto rights. Again, we disagree.

The controlling date for determining the amount of a sentencing fine is the date of the defendant's offense. (*People v. Souza* (2012) 54 Cal.4th 90, 143; *People v. Valenzuela* (2009) 172 Cal.App.4th 1246, 1248; *People v. Saelee* (1995) 35 Cal.App.4th 27, 30-31.) If the amount of a fine increases from the time of the offense to the time of sentencing, ex post facto principles generally preclude imposition of the increased amount. (*Ibid.*)

When San Nicolas committed his crimes in 2011, the statutorily prescribed minimum restitution fine for a felony offense was $200, and the maximum amount was $10,000. (Pen. Code, § 1202.4, former subd. (b)(1); *People v. Holman* (2013) 214 Cal.App.4th 1438, 1452.) By the time he was sentenced in 2012, the maximum fine was still $10,000, but the minimum had risen to $240. (Pen. Code, § 1202.4, subd. (b)(1).) San Nicolas contends that by fining him $240 for each of his crimes, it appears the court was trying "to impose the minimum fines, but incorrectly calculated [them] at the new rate of $240 per offense."

However, "[i]n the absence of evidence to the contrary, we presume that the court 'knows and applies the correct statutory and case law.' [Citations.]" (*People v. Thomas* (2011) 52 Cal.4th 336, 361.) To overcome this presumption, "[t]he party attacking the judgment must clearly and affirmatively demonstrate that the trial court relied on improper considerations. [Citation.]" (*People v. Superior Court (Du)* (1992)

16

5 Cal.App.4th 822, 835.) Other than that the amount of his individual fines matched the minimum amount available under the new law, there is nothing in the record to support San Nicolas' belief the trial court intended to impose the minimum fine or that it relied on the wrong version of the statute. In fact, it is undisputed that the amount imposed was well within the limits of the older version of the statute that was in effect when San Nicolas committed his crimes. (Pen. Code, § 1202.4, former subd. (b)(1) [authorizing a restitution fine as high as $10,000 for each felony offense]; *People v. Holman, supra,* 214 Cal.App.4th at p. 1452.) Therefore, contrary to San Nicolas' claim, his fines were not unauthorized.[2]

For the same reason, the fines did not violate the ex post facto clause. In arguing otherwise, San Nicolas relies on *Peugh v. United States* (2013) 569 U.S. ___ [133 S.Ct. 2072]. In that case, the defendant faced a recommended sentence of 37 to 46 months in prison under the federal sentencing guidelines that governed at the time of his offense. (*Id.* at p. 2078.) However, by the time he was sentenced, the guidelines had been revised upwards so that his recommended term was 70 to 87 months. (*Id.* at p. 2079.) In imposing a 70-month sentence, it was clear the trial court relied on the revised guidelines. In fact, the court's sentence was well outside the recommended guidelines that were in effect when the defendant committed his offense. Under these circumstances, the high court found the sentence violated the ex post facto clause. (*Id.* at pp. 2081-2084.)

Unlike the situation in *Peugh,* San Nicolas' fine falls squarely within the statutorily prescribed parameters that existed at the time of his offenses. Because of that, and because San Nicolas has failed to establish the trial court relied on any other

---

2     That being the case, it was incumbent on San Nicolas to object to his fines if he thought they were unlawful. By failing to do so, he arguably forfeited his right to challenge them on appeal. (See generally *People v. Scott* (1994) 9 Cal.4th 331, 354.)

17

parameters, we affirm his sentence.  Imposition of a $240 restitution fine for each of his offenses was both statutorily authorized and constitutionally permissible.

DISPOSITION

The judgment is affirmed.


BEDSWORTH, ACTING P. J.

WE CONCUR:


IKOLA, J.


THOMPSON, J.