Filed 8/21/14  P. v. Medrano CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B247087 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA364189) |
| v. | |
| JUAN GILBERTO MEDRANO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Bob S. Bowers, Jr., Judge.  Affirmed in part and remanded with directions.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

Juan Gilberto Medrano appeals from a judgment and sentence, following his convictions for two murders and one assault. He raises numerous contentions of trial court error, including failure to properly instruct the jury on the provocative act doctrine and failure to give a unanimity instruction, admission of improper lay opinion and prejudicial gang evidence, improper handling of a juror who disputed a translation of witness testimony, and improper sentencing. He also contends there was insufficient evidence to sustain his conviction for the murder of an accomplice under the provocative act doctrine. The People request that this court amend the abstract of judgment to correct certain assessments and penalties, and otherwise, affirm the judgment. For the reasons stated below, we will affirm the convictions, and remand the matter with directions to the superior court to modify the abstract of judgment to correct the assessments and penalties.

## PROCEDURAL HISTORY

In an amended information, appellant was charged with the murder of Javier Mejia (Pen. Code, § 187, subd. (a); count 1),[1] the murder of Salvador Ayala (§ 187, subd. (a); count 2), and assault by means likely to produce great bodily injury of Raul Deras (§ 245, subd. (a)(1); count 3). As to counts 1 and 2, it was further alleged that appellant personally used a knife (§ 12022, subd. (b)(1)), and that the two offenses satisfied the special circumstance of multiple murders (§ 190.2, subd. (a)(3)). Finally, it was alleged that appellant had served five prior prison terms.

A jury convicted appellant of second degree murder on counts 1 and 2, and found the weapon enhancement and special circumstance not true. It convicted

---

[1]     All further statutory citations are to the Penal Code, unless otherwise stated.

2

him as charged on count 3. The prosecution declined to proceed on the priors. On February 8, 2013, the court sentenced appellant to a total of 30 years to life on counts 1 and 2, plus three years on count 3. The court also imposed numerous assessments, fines and penalties. Appellant timely filed a notice of appeal.

## FACTUAL BACKGROUND

A. *The Prosecution Case*

Javier Mejia and Raul Deras lived in the same apartment building: Mejia and his wife, Armida Gradias, lived on the second floor, whereas Deras and his girlfriend, Kelly Soler, lived on the first floor. Salvador Ayala and his girlfriend, Karla Herrera, lived in a house across the street. Mejia, Deras, and Ayala were acquaintances, and often hung out together at Ayala's house.

During the late evening hours of October 30, 2009, Mejia, Deras, Ayala, and Ayala's brother, Christian Izquierdo, were hanging out in the front porch of Ayala's house. At around 1:00 a.m., Deras left and went home. Shortly thereafter, appellant arrived and joined the three remaining men.

Appellant was a friend of Ayala's, his "homeboy." Ayala's girlfriend, Herrera, testified that Ayala considered a "homeboy" a closer friend than someone who was not a "homeboy." Izquierdo also stated that Ayala and appellant were "homeboys" from "Baldwin Park back then," but he did not know much about their relationship as he "never had been gang-banged." After Mejia made some derogatory comments about appellant's nationality, an argument broke out between Ayala and Mejia. Izquierdo managed to diffuse the situation. About 20 minutes later, Izquierdo left and went inside Ayala's house to sleep.

At around 2:00 a.m., appellant knocked on the front door of Ayala's house to wake Herrera. Appellant told her that Ayala and Mejia were fighting. They went outside, and Herrera tried to stop the fight. Unable to do so, she went back

3

into the house to wake Izquierdo and ask him for assistance. The two then went outside, and Izquierdo was successful in separating the two fighters.

Meanwhile, Deras and his girlfriend Soler were awakened by the sounds of the fight. They went outside to observe. Appellant walked up to Deras and asked, "What's going on here?" Deras said the men were fighting, and appellant said, "Why don't you and your bitch ass lady go inside the house?" Deras said he wanted to stop the fight, and appellant told him to "let them fight." Appellant told Deras to get his "bitch ass inside the house." When Deras refused, appellant punched him in the face. The two men then began fighting. Deras put appellant into a headlock. Appellant bit Deras's hand and punched him, breaking Deras's nose.

Eventually, the fighting stopped. Deras, Soler and Mejia walked across the street back to their homes. As they left, Deras heard Ayala say he was a "Southsider" and that he was going to kill them. Appellant was standing next to Ayala when Ayala made these comments. After Deras and Soler entered their home, they began cleaning the blood from Deras's face.

Izquierdo managed to bring Ayala inside the house. Izquierdo and Herrera tried to calm him. Appellant also tried to calm Ayala. Appellant told Ayala that his problem was not with "us," but with "them." Appellant kept telling Ayala, "Just calm down. We can fix it later." He also said, "We'll get on them later." After some further argument, appellant and Ayala left the house.

Herrera saw appellant and Ayala run across the street toward Mejia's apartment. Herrera testified Ayala was holding nothing when he left the house. Nor did she see Ayala go into the kitchen when he was inside the house. She did not look at appellant's hands and did not notice if he was holding anything.

4

Meanwhile, Mejia's wife, Gradias, awoke to the sounds of fighting. She looked out from the balcony of her apartment and saw Deras fighting with appellant and Ayala. Appellant was hitting Deras. Mejia then entered the apartment through the back door. He told Gradias to call the police. He appeared scared, had a small cut on his face, and did not look well. He said he had fought with Ayala and had hit him in the face. He said there was "an asshole with him and I'm scared." Gradias called 911 several times, but the police did not come. Mejia asked her, "Did you call the police because they are going to kill us?" Mejia then grabbed a broomstick and went back outside.

Gradias went to the balcony. She noticed that no one was outside. Mejia was standing on the grassy area on his side of the street. Gradias told him everyone had gone inside, and asked him to return home. Mejia called 911 on his cell phone. He told the operator, "There's people that are looking for problems. They already kicked my ass and everything." He said they had threatened to kill him. When the operator asked Mejia to describe the person who threatened to kill him, he said "he" was Hispanic, about 5-foot-8-inches, 180 to 190 pounds. Mejia said he did not know the person very well but had seen him before.

Gradias saw Ayala and appellant come out of Ayala's house. They each held a knife. Gradias told Mejia to hurry inside. Mejia ran toward the back of the apartment, while still on the phone with the 911 operator. Ayala and appellant chased after him. Gradias ran to open the back door for Mejia. The door was jammed, and neither Gradias nor Mejia could get it open. Mejia was screaming and calling Gradias's name, telling her to open the door. Through the window in the door, Gradias saw two shadows hitting Mejia. She heard three voices, including appellant's. She heard the sounds of a fight and items being thrown.

She also heard Mejia and another person screaming; she had never heard Mejia scream like that before.

Deras and Soler were cleaning Deras's face when they heard noises from the back of the building. Deras heard Mejia screaming for Gradias. They went out of their apartment's back door to investigate. Soler heard the sounds of people running up the stairs. Deras heard screaming and fighting on Mejia's balcony. When Deras went to the stairwell, he saw appellant, Ayala, and Mejia on the balcony. Mejia and Ayala were fighting. Appellant was hitting and throwing "stuff" at Mejia. As Deras walked up the stairs to get closer, appellant turned around and saw him. Appellant then began throwing chairs and "everything metal" down at Deras. Aside from the sound of chairs being thrown, Soler also heard shouting and Mejia screaming. She pulled Deras back into their apartment and called the police. From inside his apartment, Deras heard the sounds of people running down the stairs and toward the front of the building.

After the commotion ended, Mejia broke the glass in the door of his apartment and came inside. He looked pale. He said, "My love, call the ambulance because I got stabbed." Mejia sat down, bleeding. Gradias went to the balcony and screamed for help. Soler heard Gradias screaming. Deras and Soler went to Mejia's apartment and saw blood everywhere. They unsuccessfully tried to revive Mejia.

Mejia died from a single stab wound to his lower right back. Mejia also had a stab wound on the back of his left forearm. He had abrasions and lacerations on his face, his upper arms and his hands. A cut on Mejia's palm was consistent with a defensive wound, but could have been caused by Mejia's hand slipping when he stabbed someone. Deras suffered a broken nose and broken finger. His broken finger required surgery.

Meanwhile, appellant and Ayala ran to the front of Ayala's house and got into appellant's car. Ayala screamed, "I'm dying, I'm dying." Ayala got back out of the car and walked toward the back of his house. Appellant drove away. Herrera and Izquierdo went outside the house and followed Ayala. Ayala was gasping for air. Herrera asked him what was wrong. Izquierdo asked Ayala if he had been shot or stabbed. Ayala told Izquierdo that he did not hear a gun and kept saying that they did not stab him. Herrera went inside to call 911, and an ambulance subsequently took Ayala to the hospital.

Ayala died of a stab wound to his left lower back. He also had bruises and abrasions on his forehead, his upper right back and the backs of both hands. He had abrasions and cuts on his right knee and ankle. He had cuts on both forearms, at least one of which was probably caused by a knife.

A 13½ inch "ChefMate" knife with blood stains was collected from the balcony near Mejia's back door. Inside Ayala's house, a similar knife was found on the drying rack in the kitchen. It was the same brand and style as the knife found on the balcony, but it was a different size. No other knife was found around the crime scene or in appellant's car.

Deras and Soler were interviewed by the police about Mejia's murder. They selected appellant's picture in a photographic lineup as the person they had seen with Ayala that day. Three days after the incident, appellant was arrested for Mejia's murder in Fontana, about 50 to 60 miles from the crime scene. In the trashcan at appellant's residence, police found sweatpants, a hoody, and towels, all with bloodstains. At the time of his arrest, appellant was five feet, seven inches tall, and weighed 190 pounds.

B.    *The Defense Case*

Appellant did not testify.  During an interview with police on November 1, 2009, Gradias was unable to select appellant's picture in a photographic lineup. She said, "Oh, my god, I can't see well."  When asked whether she used glasses, she replied, "Yes, but I didn't see him that well."  At the preliminary hearing, Gradias testified that she saw two people fighting, but that it was too dark to see who they were.  Mejia was the sole source of the DNA collected from the bloodstains on the knife recovered from the balcony.

## DISCUSSION

A.    *Provocative Act Theory of Murder*

The prosecution's case regarding the murder of Ayala (count 2) relied on the provocative act doctrine.  "Under the provocative act doctrine, when the perpetrator of a crime maliciously commits an act that is likely to result in death, and the victim kills in reasonable response to that act, the perpetrator is guilty of murder." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 655.)  "Provocative act murder may be either of the first or second degree. [Citations.]  When the defendant acts with express malice alone or with implied malice, provocative act murder is of the second degree.  When the defendant acts with express malice and is also willful, deliberate, and premeditated, it is murder of the first degree." (*People v. Mejia* (2012) 211 Cal.App.4th 586, 604 (*Mejia*).)  A defendant demonstrates express malice when he "intentionally acts with the specific intent to kill, or aids and abets in the underlying crime with same state of mind." (*Ibid.*)  A defendant demonstrates implied malice "when . . . , with conscious disregard for human life, [he] intentionally acts in a manner inherently dangerous to human life or, with the same state of mind, aids and abets in the underlying crime." (*Ibid.*)  "If the underlying crime which provokes the killing does not require an intent to kill,

8

the provocative conduct must be an act beyond that necessary simply to commit the crime. [Citations.] Where the underlying crime requires an intent to kill, however, conduct necessary to commit the crime is sufficient to constitute the provocative act." (*Ibid.*)

Before the jury was instructed on the provocative act doctrine, defense counsel objected, arguing that the prosecution had not presented sufficient evidence to support that theory of murder. Defense counsel contended that "the evidence is circumstantial . . . [and] open to too many reasonable interpretations for a jury to find that the only reason or the major or substantial cause of Mr. Mejia killing Mr. Ayala was that the defendant was present there and attacking him." The court overruled the objection, finding that there was sufficient evidence to submit the issue to the jury. After being advised that the jury would be given the instruction, defense counsel never requested clarifying or amplifying instructions. The judge then instructed the jury, in relevant part, as follows:

> "The defendant is charged in Count [2] with murder. A person can be guilty of murder under the provocative act doctrine even if someone else did the actual killing.
>
> "To prove that the defendant is guilty of murder under the provocative act doctrine, the People must prove that:
>
> "1. In committing the murder against Javier Mejia, the defendant intentionally did a provocative act;
>
> "2. The defendant knew that the natural and probable consequences of the provocative act were dangerous to human life and then acted with conscious disregard for life;
>
> "3. In response to the defendant's provocative act, Javier Mejia killed Salvador Ayala;
>
> "AND

9

"4.  Salvador Ayala's death was the natural and probable consequence of the defendant's provocative act."[2]

Appellant now contends that the trial court gave an incomplete instruction on the provocative act doctrine.  According to appellant, the evidence, at most, showed that he intended to assault Mejia jointly with Ayala (the underlying crime).  As malice is not an element of the crime of assault, he could be convicted of the murder of Ayala only if the jury found that he committed a provocative act separate from the conduct necessary to accomplish the assault.  Thus, appellant argues, the trial court should have instructed the jury, sua sponte, that in order to find appellant guilty of Ayala's murder, it must find that he committed a provocative act beyond what was necessary to assault Mejia.  Appellant also contends there was insufficient evidence to convict him under the provocative act doctrine.  We disagree.

"'The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request.'  [Citations.]"  (*People v. Rogers* (2006) 39 Cal.4th 826, 866; accord, *People v. Breverman* (1998) 19 Cal.4th 142, 154.)  "A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.  [Citation.]"  (*People v. Lang* (1989) 49 Cal.3d 991, 1024.)

---

[2]     The jury also was instructed that the provocative act comprised either of the following acts:  (1) "the defendant attacked Javier Mejia at the same time as Salvador Ayala," or (2) "the defendant prevented Raul Deras from coming to Javier Mejia's aid by throwing furniture at him," or both.

10

As an initial matter, we conclude that appellant has forfeited his claim of instructional error. Appellant contends the trial court should have included additional language sua sponte, but defense counsel did not object to the substance of the instruction. Rather, counsel argued that the instruction on the provocative act doctrine should not be given at all, as there was insufficient evidence to present the case to the jury. After being advised that the court would give the instruction, counsel did not seek clarifying or amplifying language. Accordingly, appellant may not challenge the form of the instruction on appeal.

Even were we to find no forfeiture, we would hold that there was no instructional error. "A murder conviction under the provocative act doctrine . . . requires proof that the defendant personally harbored the mental state of malice, and either the defendant or an accomplice intentionally committed a provocative act that proximately caused an unlawful killing." (*People v. Gonzalez*, *supra*, 54 Cal.4th at p. 655.) Here, the jury was instructed that it could convict appellant of the murder of Ayala under the provocative act doctrine only if the prosecution proved that appellant personally harbored malice. Specifically, the jury was instructed that the prosecution must prove that appellant knew that "[t]he natural and probable consequences of the [provocative] act [were] dangerous to human life" and then "acted with conscious disregard for human life." The jury also was instructed that the prosecution had to prove that appellant "intentionally did a provocative act" by "committing the murder against Javier Mejia." As murder requires malice (§ 187), the "conduct necessary to commit the crime [of murder] is sufficient to constitute the provocative act." (*Mejia*, *supra*, 211 Cal.App.4th at p. 604; see also *People v. Karapetyan* (2003) 106 Cal.App.4th 609, 619 ["where the defendant attempts to kill or assault someone with a firearm, there is no need for a separate provocative act to be committed; the act of

11

attempting to kill is by itself a provocative act that is likely to draw a deadly response"].)  As the jury was not required to find, in order to convict appellant of Ayala's murder, that he committed a provocative act other than the murder of Mejia, no instructional error occurred.

We also reject appellant's contention that no substantial evidence supported his conviction for Ayala's murder.  "In determining whether the evidence is sufficient to support a conviction . . . , 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'  [Citations.]"  (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1224, italics omitted.)  The elements of the crime of provocative act murder are: (1) "that the defendant personally harbored the mental state of malice," (2) that "either the defendant or an accomplice intentionally committed a provocative act," and (3) that the provocative act "proximately caused an unlawful killing."  Intent is "rarely susceptible of direct proof and must therefore be proven circumstantially." (*People v. Thomas* (2011) 52 Cal.4th 336, 355.)

Substantial evidence in the record supports appellant's conviction.  Ayala, appellant's "homeboy," had threatened to kill Mejia and Deras.  Appellant, who was standing nearby, did not refute Ayala's threats, and Mejia told the 911 operator that two men, including one man who resembled appellant, had threatened to kill him.  Moreover, appellant encouraged Ayala to carry out his threat.  After the initial altercations with Mejia and Deras, appellant told Ayala, "[W]e can fix it later," and "We will get on them later."  Shortly, thereafter, appellant and Ayala left Ayala's house together, running toward Mejia's apartment.  The jury could reasonably infer that the two men were setting out to make good on the threat.

12

Furthermore, the evidence demonstrates that appellant aided and abetted Ayala in the murder of Mejia. He participated in the attacks on Mejia, and he prevented Deras from defending Mejia or separating Ayala and Mejia. Gradias, Mejia's wife, saw two shadows hitting Mejia. She also heard three voices, including her husband's and appellant's. Deras saw Ayala fighting with Mejia, and he saw appellant hitting and throwing things at Mejia. When Deras tried to mount the stairs to assist Mejia, appellant blocked his way by throwing furniture down the stairwell at him.

On this record, substantial evidence demonstrates that appellant acted with malice. Appellant threatened to kill Mejia, or acquiesced in Ayala's threat. He promoted another violent encounter between Ayala and Mejia, by promising Ayala that "we" would retaliate against Mejia and Deras later. Appellant and Ayala, armed with a knife, chased Mejia up the stairwell to the balcony outside Mejia's apartment and attacked him as Mejia sought desperately to escape into his apartment. Appellant participated in the lethal attack on Mejia, and he prevented Deras from saving Mejia by throwing furniture at him. From this evidence, the jury could infer that appellant acted with malice: he acted with a conscious disregard for human life when he assisted Ayala in killing Mejia. (*Mejia*, *supra*, 211 Cal.App.4th at p. 604.)

Moreover, the same evidence shows that appellant and Ayala intentionally committed a provocative act -- the murder of Mejia -- that resulted in Ayala's death. Appellant and Ayala initiated a violent encounter that resulted in the deaths of Mejia and Ayala. (Cf. *People v. Gonzalez*, *supra*, 54 Cal.4th at p. 657 [defendant guilty of death of accomplice under provocative act doctrine, as "[s]he put the violent conduct into motion after a night of repose"].) Here, the evidence showed (1) that a prior altercation between Ayala and Mejia had been resolved

13

without serious injury to either man; (2) that Ayala -- and possibly appellant -- had threatened to kill Mejia; (3) that appellant and Ayala jointly chased Mejia up the stairwell and attacked him outside his apartment; (4) that between appellant and Ayala, they were armed with a knife; (5) that Mejia died from a knife wound; and (6) that Ayala also died from a knife wound, likely from Mejia's defensive stabbing. In short, sufficient evidence supported appellant's conviction for the murder of Ayala, as there was substantial evidence that appellant personally harbored malice, that he aided and abetted Ayala in murdering Mejia, and that his actions resulted in the death of Ayala.

      B.     *Lay Opinion of Appellant's Mental State*

          1.     *Factual Background*

After Deras testified, the defense questioned a police detective about an interview he had conducted with Deras a few days after the murders. During the interview, the detective asked whether Deras heard appellant trying to stop Ayala on the balcony. Deras answered, "No. He was just standing right there and [Ayala] at that point was doing everything, and then that guy was also throwing stuff at [Mejia]."

On redirect examination, the detective testified that he spoke with Deras at length about what happened on the staircase. The detective asked Deras, "Do you think that he was actively involved in trying to hurt [Mejia], would you say?" Deras responded, " He was, because he was pretty, I don't know, he was, he didn't want to stop nothing I guess. He just wanted to keep on, you know, hurting [Mejia]." Defense counsel objected as speculative, explaining, "He asked [Deras] his opinion in this statement. The opinion in itself if it were offered in court would be speculation." The court responded, "It would be his opinion, I guess if it were

14

offered in court. There is a jury instruction I guess about lay opinion also." The court overruled the objection.

The detective further testified that Deras's statement continued, "Hitting I believe because he, he got in a fight with [Mejia], he got down with [Mejia] so I guess he was mad. . . . So at all times he went up to me, he was mad like he really wants to do something, he never really tried to stop the [fight] or nothing. He just went towards me trying to start it even more." Defense counsel again objected, and the court stated, "Same ruling."

2. *Analysis*

"A lay witness may testify to an opinion if it is rationally based on the witness's perception and if it is helpful to a clear understanding of his testimony. (Evid. Code, § 800.)" (*People v. Farnam* (2002) 28 Cal.4th 107, 153.) "A lay witness generally may not give an opinion about another person's state of mind, but may testify about objective behavior and describe behavior as being consistent with a state of mind." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 130.) The trial court's ruling on admission of a lay opinion is reviewed for an abuse of discretion. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1254.)

Appellant contends that Deras's opinions on his state of mind -- that appellant intended to hurt Mejia during the incident and that appellant was "mad like he really wanted to do something" -- were impermissible lay opinions. We disagree. Deras's opinion testimony was based on his personal contemporaneous observations and was helpful to the jury to explain how appellant's actions (not stopping Ayala from fighting with Deras, throwing objects at Mejia, preventing Deras from assisting Mejia) were consistent with a specific state of mind (intent to harm). Moreover, even were we to find error, we would deem it harmless. (See *People v. DeHoyos*, *supra*, 57 Cal.4th at p. 131 [exclusion of lay opinion on state

15

of mind reviewed for harmless error under *People v. Watson* (1956) 46 Cal.2d 818].) As discussed, there was substantial evidence apart from Deras's opinion testimony to show that appellant harbored malice against Mejia. Thus, there is no reasonable probability the jury would have reached a more favorable verdict if the trial court had excluded that portion of Deras's testimony.

      C.    *Admission of Testimony that Appellant was Ayala's "Homeboy"*

      At trial, Herrera testified that Ayala called appellant his "homeboy." The prosecutor then sought to elicit testimony that Ayala valued his "homeboys" over other friends, even neighbors like Mejia and Deras. The trial court overruled defense counsel's objection under Evidence Code section 352, and permitted the inquiry. Later, without objection, the prosecutor introduced Izquierdo's statement, made to the police, that appellant and Ayala were "homeboys from . . . Baldwin Park back then, in school, probably, so -- I'm -- never had been gang-banged."

      Appellant contends the trial court erred in allowing this evidence. He argues that the term "homeboy" is commonly understood to mean being members of a criminal street gang. Thus, appellant contends, the court improperly admitted the evidence under Evidence Code section 352, as it was more prejudicial than probative. He also contends that the admission of the evidence deprived him of due process.

      Under Evidence Code section 352, a trial court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352.) "In cases *not* involving the gang enhancement, . . . evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal. [Citation.] But evidence

16

of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation -- including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like -- can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) "The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason." (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369.) Moreover, "'[t]he admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.'" (*People v. Jones* (2013) 57 Cal.4th 899, 949.)

Here, even assuming that the "homeboy" evidence was gang evidence, the reference was relevant and highly probative to the charged crimes. As Ayala's girlfriend Herrera testified, a "homeboy" was a particularly close friend. The evidence explained why Ayala initially argued and fought with Mejia, even though they were neighbors who often hung out together: Ayala was angry because Mejia had insulted appellant -- Ayala's homeboy -- by making derogatory comments about his nationality. In addition, the evidence helped show why appellant would aid Ayala in carrying out his threat to kill Mejia. Thus, unlike in *People v. Memory* (2010) 182 Cal.App.4th 835 (*Memory*) and *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*), the evidence was highly probative. (See *Memory*, *supra*, 182 Cal.App.4th at pp. 852-858 [evidence that defendants belonged to motorcycle club not relevant to identity, which was not genuinely in dispute, and not probative on motive and intent]; *Albarran*, *supra*, 149 Cal.App.4th

17

at p. 231 [admitted gang evidence irrelevant to motive and intent on charged crimes].)

In contrast, any prejudice was minimal. There were only two oblique references to criminal street gangs in the trial testimony: (1) Ayala's threat that he was a "Southsider" and would kill Mejia, and (2) Izquierdo's statement to the police that he was unsure of the exact relationship between Ayala and appellant, as he never had been "gang-banged." Moreover, apart from mistakenly stating that Ayala had shouted that he was a "Sureno," the prosecutor otherwise made no mention of street gangs in his opening or closing arguments. (Cf. *Albarran*, *supra*, 149 Cal.App.4th at pp. 227-228 [trial court admitted extensive gang evidence, including highly inflammatory evidence that gang made threats to kill police officers].) Thus, the probative value of the gang evidence was not substantially outweighed by the danger of undue prejudice. On this record, we conclude the court did not exceed its discretion in admitting the evidence that appellant was Ayala's "homeboy."

Nor did the admission of the evidence deprive appellant of his due process right to a fair trial. *People v. Mendoza* (2000) 24 Cal.4th 130 (*Mendoza*) is instructive. There, the defendant was charged with committing numerous crimes against multiple victims; no gang allegations were charged. (*Id*. at p. 148.) At trial, a victim testified that during the robbery and kidnapping, the defendant had said he was "'a homeboy and that he had his friends around someplace.'" She later testified that she understood the term "homeboy" to mean that defendant was in a gang. Defense counsel objected, but the trial court overruled the objection on the ground that the question was relevant to show the victim was in fear at the time of the offenses. Another victim also testified that defendant said he was a "homeboy" and that "'he had people around him.'" Finally, during closing argument, the

18

prosecutor referred to another robbery victim's description of defendant's hair as "'combed back like Cholo style, gang style.'" (*Id*. at pp. 162-163.) The court found these comments did not result in gross unfairness amounting to a denial of defendant's constitutional right to due process. (*Id*. at p. 163.) Similarly, the comments about "homeboy" in the instant case -- which were far fewer than in *Mendoza* -- did not result in unfairness depriving appellant of his constitutional right to due process.

      D.     *Clarifying Translation of Gradias's Testimony*

          1.     *Factual Background*

Before trial, the court instructed the jury that if a witness used an interpreter, the jury must rely on the translation provided by the interpreter, even if a juror understood the language spoken by the witness. Jurors were not permitted to retranslate any testimony for other jurors. If a juror believed that some testimony was mistranslated, the jury was instructed to inform the court.

Gradias, Mejia's wife, testified with a Spanish language interpreter. According to Gradias, when Mejia got into the apartment after the attack on the balcony, he said, "My love, call the ambulance because I got stabbed." During the next break, outside the presence of the other jurors, Juror No. 20 informed the court that he believed something was incorrectly translated. Gradias had testified Mejia had said, "me picaron," which the interpreter had translated, as "I got stabbed." The juror, a native Spanish speaker, stated that "me picaron" is plural, so it should have been translated as "they stabbed me." The interpreter explained, "it's very, very common for a Spanish speaker to say, to use the plural even though it was an individual who made the statement or who did the action. I got stabbed when he said me picaron. . . . It's a general concept of I got stabbed. It may

appear as a plural. That's why to omit mistakes, it's more appropriate to use the passive . . . tense of the verb."

At sidebar, the court indicated it would accept the "I got stabbed" interpretation, and that it would ask the juror whether he could still follow the interpreter's translation even if he disagreed with it. Defense counsel said, "That's fine." The prosecutor said he intended to ask Gradias to clarify the matter when she returned to the stand. The court said, "Just bring her back in here." Defense counsel said, "That's fine."

Gradias resumed the stand. Outside the presence of the other jurors, she clarified that Mejia had stated, "I got stabbed," not "they stabbed me." After Gradias was excused, the court asked the juror whether he could accept the original translation that occurred during trial. The juror stated that he could, and trial resumed.

2.    *Analysis*

"It is integral to the promise of a fair trial that all jurors in a particular case base their decision on the same evidence." (*United States v. Cabrera-Beltran* (4th Cir. 2011) 660 F.3d 742, 750 [noting that juror who refuses to accept a court-approved translation is effectively deciding to base his verdict on evidence different than that considered by the other jurors].) Appellant contends the trial court prejudicially erred in allowing Gradias to testify before Juror No. 20, outside the presence of the other jurors. Thus, he argues, the jury did not render their verdicts on the same evidence. We find no reversible error.

As an initial matter, the issue is forfeited, as defense counsel affirmatively agreed to allow Gradias to testify before the lone juror on this issue. Even were we to find no forfeiture, we would find any error harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) Appellant was not denied an

20

opportunity to object to Gradias's new testimony, or to cross-examine her. More important, Gradias's testimony at the hearing merely clarified that the interpreter's original translation -- "I got stabbed" -- had been correct. As heard by every juror, Gradias's testimony left open the possibility that appellant did not commit the actual stabbing. Indeed, the jury found that appellant did not personally use a knife during the murder. Appellant argues that Gradias's credibility was bolstered by her demeanor and confidence during the hearing. This is rank speculation, unsupported by any evidence. On this record, any error in permitting Gradias to affirm the accuracy of the interpreter's translation was harmless beyond a reasonable doubt.

E.      *Unanimity Instruction on Charge of Assault of Deras*

"As a general rule, when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty." (*People v. Jennings* (2010) 50 Cal.4th 616, 679.) Unanimity is not necessary if both acts are part of a single course of conduct, or if the defendant offers the same defense or defenses to the various acts constituting the charged crime. (*Ibid.*)

Appellant contends that with respect to count 3, the assault on Deras, the court erred in failing to instruct sua sponte on unanimity, as there were two distinct acts that could have formed the basis for appellant's conviction. First, during the fistfight between Ayala and Mejia, appellant had punched Deras in the face when Deras refused to return to his apartment. Second, during the subsequent fight between the two men, after Deras had put appellant in a headlock, appellant had

21

bitten Deras's hand and punched him in the face, breaking Deras's nose. We find no error.

The record shows that both acts occurred so closely in time that they formed one single course of conduct. There was no delay or interruption between the first punch and the subsequent fight. (Cf. *People v. Mota* (1981) 115 Cal.App.3d 227, 232 [cases where prosecution must select one criminal act over another "feature circumstances wherein the criminal acts were separated by days, weeks or months, and sometimes the acts occurred in different places, thus forcing the prosecution to choose which act they were relying upon so that the defendant could be put on notice and properly defend against the charges"].) Thus, the two acts were "'so closely connected in time as to form part of one transaction,'" or the acts constituted a "'continuous course of conduct of a series of acts over a period of time.'" (*People v. Jennings*, *supra*, 50 Cal.4th at p. 679; see also *People v. Robbins* (1989) 209 Cal.App.3d 261, 266 [no unanimity instruction required where attack on victim was "one prolonged assault, of which the individual blows and other indignities were inseparable components"].)

F.      *Imposition of Consecutive Sentences*

The trial court imposed consecutive sentences on all three counts. Appellant contends the trial court abused its discretion by imposing consecutive life sentences for the two murder convictions. He argues that the factual circumstances favored concurrent sentences. We find no error.

A single valid aggravating factor is sufficient to support the imposition of consecutive sentences. (*People v. Davis* (1995) 10 Cal.4th 463, 552.) As appellant concedes, he has a lengthy criminal history, including having served multiple prison terms. Appellant's recidivism is an aggravating factor that can support imposition of consecutive sentences. (See Cal. Rules of Court, rule 4.421(b)(2) &

22

(3).)  Similarly, appellant's conviction of murder for two separately named victims can support imposition of consecutive sentences.  (See *People v. Calhoun* (2007) 40 Cal.4th 398, 407, fn. 6.)  The fact that one victim was unintended is no excuse, as people who create dangerous situations are as morally culpable for the death of an accomplice as for the death of a nonaccomplice.  (See *In re Aurelio R.* (1985) 167 Cal.App.3d 52, 60 ["More people will be deterred if they know when the smoke clears they will be held accountable for all the dead bodies, friend or foe alike."].)  In short, there was no abuse of discretion.

G.      *Imposition of Certain Assessments, Fines, and Penalties*

Government Code section 70373, subdivision (a)(1) provides that a $30 criminal conviction assessment to fund court facilities shall be imposed on every count of criminal conviction.  (*People v. Sencion* (2012) 211 Cal.App.4th 480, 483.)  Appellant was convicted of three counts, but the trial court imposed an assessment of $120.  The People concede the error, and we agree.  Accordingly, we will modify the judgment to reduce the criminal conviction assessment to $90.  (*People v. Sencion*, *supra*, 211 Cal.App.4th at pp. 484-485.)

The trial court also imposed a $300 restitution fine (§ 1202.4) and a $300 stayed parole revocation restitution fine (§ 1202.45).  In addition, the court imposed the following penalties:  two $60 DNA penalty assessments (Gov. Code, § 76104.6, subd. (a)(3)(A); Gov. Code, § 76104.7, subd. (c)(1)), a $60 state court construction penalty assessment (Gov. Code, § 70372, subd. (a)(2)(A)), a $120 state penalty assessment (§ 1464, subd. (a)(3)(A)), and a $24 state penalty surcharge (§ 1465.7).

Section 1202.4, subdivision (e) states that "[t]he restitution fine shall not be subject to penalty assessments authorized in Section 1464" or the Government Code beginning with section 76000, "or the state surcharge authorized in Section

23

1465.7." Similarly, Government Code section 70372, subdivision (a)(2)(A) states that the construction penalty provided for in that section does not apply to a restitution fine. As there was no other fine on which to base the surcharges, the court committed jurisdictional sentencing error in imposing them. Accordingly, we will strike the charges. (See *People v. McHenry* (2000) 77 Cal.App.4th 730, 732.)

## DISPOSITION

The convictions are affirmed, and the matter remanded with directions to the superior court to modify the abstract of judgment to correct the amount of assessments and fines. On remand, the clerk of the superior court shall prepare and deliver to the Department of Corrections an amended abstract of judgment consistent with this opinion. As amended, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**

MANELLA, J.

We concur:

EPSTEIN, P. J.                                    EDMON, J.*

_____
* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

24